## ANNE B. CRYSTAL, petitioner.

Suffolk. September 17, 1953. — December 4, 1953.

Present: QUA, C.J., LUMMUS, RONAN, & WILLIAMS, JJ.

*Contempt. Jurisdiction*, Contempt. *Equity Pleading and Practice*, Contempt proceeding, Appeal. *Habeas Corpus. Error, Writ of. Ne Exeat, Writ of.*

A Probate Court as matter of law never acquired jurisdiction to adjudge in contempt the respondent in an equity case "because of her failure to comply with and perform the final decree in this case" and to order her confined in jail "because of said contempt and for the purpose of enforcing the decree" where it appeared that, while confined in jail on a writ of ne exeat, she was brought into court for the entry of a final decree in the equity case and without notice of any contempt proceeding, that such final decree, ordering her to turn over substantial amounts of money, bonds and other property, was then read to her by the judge and entered, that, after questions to and answers by her indicating that she could not or was unwilling to comply with the decree, the petitioner in the equity case requested permission to file a contempt petition, and that thereupon, after a conference for a few minutes between the respondent and her counsel's associate, a brief conference at the bench and further questions by the judge, he read a decree so adjudging her in contempt and ordering her confined. [587–588]

A contempt proceeding to enforce performance of a final decree in a suit in equity is a separate proceeding in which there must be conformity with due process of law. [588]

A mere statement by the respondent in a proceeding in equity in a Probate Court of intention not to perform the terms of the final decree, made respectfully to the judge before there had been an opportunity to perform and at a time when the respondent had the right to appeal from the final decree, would not be in itself contemptuous. [589–590]

A writ of error does not lie to review a decree of a Probate Court in a contempt proceeding designed solely to enforce a previous decree in equity and not to punish a criminal contempt. [590]

A decree of a Probate Court adjudging the respondent in an equity case in contempt solely for failure to comply with the terms of the final decree and for the purpose of enforcing performance of that decree was appealable by the alleged contemner in order to determine the jurisdiction of the court to enter the contempt decree. [591]

One adjudged in contempt by a decree of a Probate Court solely for failure to comply with a previous equity decree and confined in jail

"because of said contempt and for the purpose of enforcing the [equity] decree" was entitled to a writ of habeas corpus to secure his release from confinement where the court had not acquired jurisdiction to adjudge him in contempt, even though he could have appealed from the contempt decree. [590–591]

There was no legal necessity for a Probate Court to discharge the respondent in an equity case from custody in jail pursuant to a writ of ne exeat upon entry of the final decree. [592]

PETITION, filed in the Supreme Judicial Court for the county of Suffolk on April 29, 1953, for a writ of habeas corpus.

The proceeding was reported by *Wilkins*, J., without decision.

*Raymond T. King*, (*Frederick M. Kingsbury* with him,) for the petitioner.

*Abraham I. Smith*, for Milton L. Kobrosky, conservator.

QUA, C.J. The petitioner, who represents herself as of Montreal in the Province of Quebec, seeks a writ of habeas corpus directed to the sheriff of our county of Hampden to obtain the release of the petitioner from imprisonment in the jail of that county under a decree of the Probate Court adjudging her in contempt for failure to comply with a previous decree of that court entered in a proceeding in equity brought against her by her mother, Sarah Kobrosky, through the latter's conservator.

The petition in the equity case alleged the wrongful taking by the present petitioner, Mrs. Crystal, of substantial amounts of money, bonds, and other property. Appearances were entered in Mrs. Crystal's behalf by Mr. Ehrlich and Mr. Dowd, who are associated in the practice of law. Throughout the hearing Mr. Ehrlich represented Mrs. Crystal. Mr. Dowd from time to time occupied a seat at her counsel table. At the conclusion of the hearing and before any decree was entered a writ of ne exeat was issued pursuant to which Mrs. Crystal was confined at the jail from January 29, 1953, until March 2, 1953.

On March 2, 1953, further proceedings took place in the Probate Court which it will be necessary to describe in some detail as they appear from findings of the single justice of

this court and the transcript by the stenographer in the Probate Court, which is incorporated in those findings. Mrs. Crystal was present in the court room. Just how she got there, being still committed on the ne exeat, does not appear from any finding in the record. [1] No order of notice was issued for her appearance. Mr. Dowd was present "in response to a notice that a final decree in the equity suit was to be entered on that day." So far as appears he had no knowledge that a contempt proceeding was contemplated. Mr. Ehrlich, who had represented Mrs. Crystal at the hearing of the case, was in Florida. Mrs. Crystal "had never consulted with Mr. Dowd on the subject prior to that day." No final decree had as yet been entered in the equity case. The judge began by saying to Mrs. Crystal, "This is the decree. . . . I want you to listen to this, because you are going to be asked questions regarding it." He then read a final decree in the equity case by which Mrs. Crystal was ordered to return and deliver to the petitioner in that case certain bonds of the State of Israel having a face value of $40,500, cash to the amount of $47,000, with $2,693 interest, and United States savings bonds to the aggregate face value of $7,775, to pay to the petitioner further sums of $5,228.46 and interest of $235.26 and $1,000 and interest of $46, both for moneys wrongfully withdrawn from banks, to assign to the petitioner all of Mrs. Crystal's right, title and interest in a certain mortgage, and to return to the petitioner a certain coin collection. Other provisions of the decree are not now material. After reading the decree the judge said, "That is the order of the court, signed by me at this moment." Mrs. Crystal was then requested to take the stand by counsel for the petitioner in the equity case, and was examined in substance as follows: "Q. Now, the judge has just read to you the terms of the final decree that he has issued, and I want to ask you at this time, Mrs. Crystal, whether or not you fully understood what the court has read to you. A. I understand. Q. Yes. Now,

---

[1] The petition to this court alleges that she was brought in on a habeas corpus ad testificandum.

are there any questions in your mind — A. I am not doing anything without the advice of legal counsel." When asked again whether there were any questions in her mind about the terms of the decree as read by the court, she replied, "I won't answer without my legal counsel. I want to see him first. Q. Well, all that I am asking you, Mrs. Crystal, is whether or not you understood what the court has read to you. A. I understood what Judge Stapleton read. Q. Yes. So there is no question about that? A. No." In answer to further questions she testified that she could not comply with the terms of the decree at this time or at any other time. "Q. Will you comply with the terms? A. I couldn't because I can't." She testified that she did not have the bonds of the State of Israel. "Q. If you had them would you be willing to turn them over? A. I don't think I would. My name is on them. Q. You would not? A. No." She testified that she did not have the United States bonds in her possession; that she did not know whether if she had them she would turn them over according to the order of the court; and that she did not have $47,000 in cash. "Q. And if you had that amount of money would you turn it over to your mother? A. I wouldn't have money that wasn't mine; no." As to the money withdrawn from banks, she testified that she did not have that; that her mother gave her one deposit and told her to use the other; that she was not willing to assign her right to the mortgage; that her mother "was normal before the boys got after her"; and that she had no coin collection and never heard of "such a collection like that."

At this point in the proceedings counsel for the original petitioner requested the court to allow him to file a petition that Mrs. Crystal be adjudged in contempt until she complied with the final decree that had just been entered. Mr. Dowd objected on the ground that Mrs. Crystal had not consulted counsel, and that it was "going too far to have her state here that she understands it all." The judge said he would give her "a few moments" to consult with counsel. The transcript then indicates a consultation of approxi-

mately ten minutes between Mrs. Crystal and Mr. Dowd, after which there was a brief conference of both attorneys at the bench. Thereupon, in answer to questions by the judge, Mrs. Crystal testified that she did not have "these things" and did not take them; that she did not have them "anywhere else," or in any safe deposit box, and did not deliver them to somebody to keep for her; that they were not in her control where she could get them and deliver them; that she did not take them anywhere, or put them anywhere, or give them to someone else to do something with, or take them from Springfield. The judge then said, "Well, now, Mrs. Crystal, you are adjudged in contempt for your failure to deliver the property enumerated in the decree. And I will read you the contempt decree." He thereupon read a decree which must have been previously prepared, wherein Mrs. Crystal was discharged from custody upon the ne exeat and was adjudged in contempt "because of her failure to comply with and perform the final decree in this case, which final decree was entered on this day," and wherein, "because of said contempt and for the purpose of enforcing the decree," Mrs. Crystal was ordered committed to jail to be confined until she should perform the decree or be discharged by some further order of the court. She was still confined under the contempt decree at the time of the hearing before the single justice of this court on her present petition for habeas corpus.

We are of opinion that as matter of law the Probate Court never acquired jurisdiction to adjudge Mrs. Crystal in contempt.

To begin with, the alleged contempt was not of the type in which the contemner is guilty of some insult or affront to the court or of some interference with the orderly processes of the law, all within the presence and under the perception of the judge, and where summary action is required to preserve the dignity and authority of the court. There is nothing of that kind in this case. No one contends that there is. The testimony of Mrs. Crystal was given in response to questions asked of her. She used no abusive lan-

guage toward the court. She was adjudged in contempt solely "because of her failure to comply with and perform the final decree in this case." The contempt decree states its purpose to be to enforce the final decree in the equity case. It provides for the confinement of Mrs. Crystal until the decree shall be performed. See *Commonwealth* v. *Hudson*, 315 Mass. 335, 346–347. The case therefore is entirely different from such cases as *Silverton* v. *Commonwealth*, 314 Mass. 52, *Albano* v. *Commonwealth*, 315 Mass. 531, and other cases which came here on writs of error, and where both the contempt and the punishment were criminal in character.

The court did not acquire jurisdiction to commit Mrs. Crystal as for a direct contempt by reason of her failure to perform the decree then and there in the presence of the judge. It would be preposterous to expect that, having just come from jail, she would be prepared to hand over in the court room more than $53,000 in cash, over $48,000 in bonds, and the other property mentioned in performance of a decree which had not even been entered until immediately before she was placed on the stand. It seems to us plain that the court had no jurisdiction to adjudge Mrs. Crystal in contempt for failure to perform the decree until sufficient time had elapsed to enable her to perform it if she was willing and able to do so, and then only after notice and an opportunity to employ counsel of her choice, to prepare her defence either in excuse or in mitigation, and to summon witnesses if necessary. A contempt proceeding to enforce performance of a final decree, although it grows out of the original case and the petition alleging the contempt is filed in that case, is thereafter a separate proceeding to be tried apart from the original case, and the requirements of due process must be met. See *New England Novelty Co. Inc.* v. *Sandberg*, 315 Mass. 739, 751. In the case of *In re Oliver*, 333 U. S. 257, at page 275, after referring to *Ex parte Terry*, 128 U. S. 289, and to *Cooke* v. *United States*, 267 U. S. 517, the court said, "Except for a narrowly limited category of contempts, due process of law as explained in the *Cooke*

case requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority' before the public.'' It is true that this statement was made in a case where the conduct deemed contemptuous was directed against the court itself; but we see no reason why the language quoted and the requirement of notice are not equally applicable to the present case. We are bound by that decision. The case of *Kelley, petitioner*, 292 Mass. 198, is distinguishable. It was held that under the statute there involved the provisions for contempt had been "incorporated" and "interwoven" into the original criminal proceeding so as to "constitute one continuous prosecution," and so that no separate complaint for contempt was necessary, and the petitioner was in execution upon criminal process within the meaning of the second exception in G. L. (Ter. Ed.) c. 248, § 1.[1] Moreover, in that case the sum which the petitioner failed to pay was only $25, and there is no suggestion in the opinion or in the record that he had not had time to pay it or was unable to pay it.

The court acquired no jurisdiction to hold Mrs. Crystal as for direct contempt because of her statements before the court that if she had the several items of property she would not be willing to turn them over, if indeed her statements quite amounted to that. It does not seem to us that a mere statement of intention not to perform, made to the court

---

[1] "Second, He has been convicted or is in execution upon legal process, civil or criminal."

quietly and respectfully, before there has been an oppor-
tunity to perform is in itself contemptuous.  See *Baum-
gartner* v. *Joughin*, 105 Fla. 335, 339; *Dixon* v. *Dixon*, 6
Buch. 364, 370.  Such statement in such circumstances is
not in itself a failure to perform.  One may perform as soon
as performance becomes possible notwithstanding such a
statement.  Moreover, when Mrs. Crystal was in court she
had a right of appeal from the final decree to this court
under G. L. (Ter. Ed.) c. 215, § 9.  It is true that under
§ 23 the mere taking of an appeal in an equity case would
not stay proceedings under the decree, but under that sec-
tion either the Probate Court or a justice of this court might
stay all proceedings pending the appeal.  Mrs. Crystal might
never become in any real sense obligated to perform the
decree.  How then could the court hold her in contempt for
expressing her unwillingness to perform it?  And we repeat
that the transcript and the contempt decree show that Mrs.
Crystal was not adjudged in contempt for anything she said
in court but was committed for failure to perform the decree
in the equity case.

It remains to consider whether habeas corpus is a proper
remedy for this petitioner.  General Laws (Ter. Ed.) c. 248,
§ 1, provides that "Whoever is imprisoned or restrained of
his liberty may, as of right and of course, prosecute a writ
of habeas corpus, according to this chapter, to obtain re-
lease from such imprisonment or restraint, if it proves to
be unlawful, unless —."  Then follow three exceptions, none
of which is here applicable.  Notwithstanding the generality
of the language of the statute, it is settled that habeas corpus
cannot be employed as a substitute for ordinary appellate
procedure and so in general is not available where there is a
remedy by writ of error or appeal.  *Clarke's Case*, 12 Cush.
320, 321.  *Adams* v. *Vose*, 1 Gray, 51.  The petitioner in this
case had no remedy by writ of error, since the contempt
proceeding was designed solely to enforce a decree in equity,
was not to punish a criminal contempt, and was there-
fore in no sense a common law proceeding.  *Blankenburg* v.
*Commonwealth*, 260 Mass. 369, 371.  Compare pages 373–

374. *New York Central Railroad* v. *Ayer*, 253 Mass. 122, 127–128. *Scola* v. *Scola*, 318 Mass. 9, 12. See *O'Leary, petitioner*, 325 Mass. 179, 184. But the petitioner did have a remedy by appeal from the contempt decree. *Godard* v. *Babson-Dow Manuf. Co.* 319 Mass. 345, 348. *Cameron* v. *Durkin*, 321 Mass. 590, 596. *Commonwealth* v. *McHugh*, 326 Mass. 249, 275. She had this remedy, under our practice, for the purpose of determining the question of jurisdiction, even though the contempt decree was beyond the jurisdiction of the Probate Court. *Donnelly* v. *Montague*, 305 Mass. 14, 18–19. The question therefore arises whether the fact that the petitioner could have appealed from the contempt decree, and for all we know may have done so, precludes the remedy by habeas corpus. Many of our own cases as well as many cases in other jurisdictions holding or recognizing that resort cannot generally be had to habeas corpus where appellate remedies are open state or imply that this rule is subject to an exception where the court or magistrate by whose purported authority the imprisonment was imposed had no jurisdiction to impose it.[1] In *Herrick* v. *Smith*, 1 Gray, 1, 12, 49–50, Chief Justice Shaw gave as the reason for this that when the order of the court is without jurisdiction it is wholly void and not merely voidable, and the person imprisoned is entitled to be discharged without first seeking to reverse the void order. If this were not so in a case like this, and if the prisoner failed to appeal within the time allowed or lost his appeal through neglect or inability to have the appeal record prepared, he would remain in jail under a void process and yet would be deprived of the usual remedy for unlawful imprisonment. We think the petitioner may have her remedy by habeas corpus.

---

[1] *Fleming* v. *Clark*, 12 Allen, 191, 194. *Feeley's Case*, 12 Cush. 598. *Sennott's Case*, 146 Mass. 489, 492–493. *Commonwealth* v. *Huntley*, 156 Mass. 236, 237. *Stalker, petitioner*, 167 Mass. 11, 12. *Bishop, petitioner*, 172 Mass. 35, 36. *Sellers' Case*, 186 Mass. 301, 303. *Morton's Case*, 196 Mass. 21, 23. *Flito's Case*, 210 Mass. 33, 35. *Connors, petitioner*, 254 Mass. 103. *Kelley, petitioner*, 292 Mass. 198, 199. *Dolan* v. *Commonwealth*, 304 Mass. 325, 334. *O'Leary, petitioner*, 325 Mass. 179, 184. *Giltner* v. *Becker*, 133 Kans. 170. *Commonwealth* v. *Heston*, 292 Pa. 63, 66. See cases collected in 39 C. J. S., Habeas Corpus, § 36.

In view of possible questions as to the interpretation of the provisions of G. L. (Ter. Ed.) c. 215, § 23, that an appeal from a decree of a Probate Court in equity shall not suspend or stay proceedings under the decree pending an appeal, but that the Probate Court or a justice of this court may stay proceedings thereunder, we have not considered whether it would have been improper in any event to adjudge the petitioner in contempt before the time for appeal had expired. Ordinarily we would suppose that an opportunity would be allowed to appeal and to seek a stay under the statute.

It seems proper to add that there was no legal necessity for discharge of the ne exeat upon the entry of the final decree in the equity case. The purpose of the ne exeat being to hold the defendant either to give security or to perform the final decree, it would fail of its object if a defendant who gives no security and who remains in jail must be released the moment the decree is entered. See *Rice* v. *Hale*, 5 Cush. 238, 244; *Dunsmoor* v. *Bankers Surety Co.* 206 Mass. 23; *Nelson* v. *Sanderson*, 285 Mass. 583; *Cohen* v. *Cohen*, 319 Mass. 31, 36–37. The writ could have been continued in force pending an appeal from the final decree, if there was an appeal, and another writ of ne exeat can now be issued if necessity for it still exists. But since the writ is in derogation of personal liberty it cannot be continued in force any longer than necessary, and if appeal is pending it cannot be continued in force if determination of the appeal should be unduly delayed without fault of the petitioner. See *Commonwealth* v. *Whitney*, 10 Pick. 434, 438.

Judgment is to be entered that the writ issue.

*So ordered.*