MILTON L. KOBROSKY, administrator, vs. ANNE B. CRYSTAL.

Hampden.    December 8, 1954. — April 4, 1955.

Present: QUA, C.J., RONAN, WILKINS, & WILLIAMS, JJ.

*Gift. Personal Property*, Ownership. *Probate Court*, Report of material facts, Jurisdiction, Equity proceeding. *Executor and Administrator*, Title to personalty, Recovery of assets. *Equity Pleading and Practice*, Report of material facts.

Unreasonable delay by a judge of a Probate Court in making a report of material facts pursuant to G. L. (Ter. Ed.) c. 215, § 11, as amended, at the request of a respondent appealing from a final decree in a proceeding in equity would not entitle the appellant to dismissal of the proceeding. [454–455]

A Probate Court had jurisdiction under G. L. (Ter. Ed.) c. 215, § 6, as appearing in St. 1937, c. 257, as amended by St. 1939, c. 194, § 2, of a proceeding in equity brought in the name and behalf of a ward by her conservator to recover from the respondent tangible and intangible personal property allegedly a part of the ward's estate. [455–456]

A finding of a completed gift of a large sum of money in bills which a husband told his wife he had been saving for her and was "hers" was precluded where it appeared that he kept the money in a safe of which she was not found to have had any knowledge and which was located at his place of business, and it did not appear that she knew of the presence of the key to that safe in a small envelope bearing her name inside a combination safe to which he alone had access located in their bedroom closet. [457, 460]

A widow had no standing to bring a proceeding in equity to recover from the respondent assets of her husband's estate on the ground that she was a person in possession under a claim of title when the assets were taken by the respondent, where before the commencement of the proceeding an administrator of her husband's estate had been appointed and his bond had been approved and the proceeding was not brought or prosecuted for the benefit of the estate. [460–461]

PETITION IN EQUITY, filed in the Probate Court for the county of Hampden on June 4, 1952.

The case was heard by *Stapleton, J.*

*Raymond T. King*, (*Frederick M. Kingsbury & Richard S. Milstein* with him,) for the respondent.

*Abraham I. Smith*, for the petitioner.

WILKINS, J. This petition in equity was brought orig-
inally by Sarah Kobrosky whose son, Milton L. Kobrosky,
was her conservator. Sarah died on October 20, 1954, and
Milton, as special administrator of her estate, has been
made the petitioner by amendment allowed by the full
court. The original respondents were Anne B. Crystal, a
daughter of Sarah; Maurice Crystal, her husband; Irving
Miller, her cousin; and four banking institutions in Spring-
field and West Springfield. From a decree hereinafter de-
scribed, Anne and Miller appealed.[1]

The petition seeks to recover from Anne personal prop-
erty, tangible and intangible, which, now that the case has
been heard, seems to concern $47,000 in cash; bonds of the
State of Israel in the face amount of $40,500; savings bonds
of the United States of America in the face amount of
$7,775; a coin collection; the proceeds of accounts in the
Springfield Institution for Savings and West Springfield
Trust Company in the respective amounts of $5,228.46 and
$1,952.42; and a mortgage on real estate on Sharon Street,
Springfield, in the names of Sarah, Anne, and Louis Ko-
brosky. An allegation of the petition is that "all these
assets represent accumulations by her [Sarah] over a period
of fifty years." There is also a prayer to set aside convey-
ances by Anne to Miller of her interest in certain real estate,
and her transfer to him of eleven shares of capital stock in
Samuel Kobrosky & Co., Inc., as made in fraud of creditors.

The decree declared that Sarah "had the right to pos-
session" of the $47,000 in cash, the State of Israel bonds, and
the coin collection, and that they were wrongfully taken by
Anne. The decree ordered Anne to "return and deliver" to
Sarah the cash (plus $2,693 interest) and bonds, and to
"deliver" the coin collection to Sarah. Other provisions of
the decree were that Sarah is the sole owner of the United
States savings bonds, that Anne wrongfully has possession,
and that she should "return and deliver" them to Sarah;

---

[1] The appeal is not printed in the record. A copy has been received by
order of this court. G. L. (Ter. Ed.) c. 231, § 135, as amended by St. 1941,
c. 187, § 1. *Donahue* v. *Kenney,* 327 Mass. 409, 411.

that Sarah was the sole owner of the accounts in the Spring-
field Institution for Savings and in the West Springfield
Trust Company, that Anne wrongfully withdrew the money
in these accounts, and that Anne is indebted to Sarah for
the amounts of $5,228.46 and $1,000, and is ordered to pay
these amounts (plus interest of $235.26 and $46) to Sarah;
that Anne holds the Sharon Street mortgage in trust for
Sarah, and is ordered to assign all her right, title, and in-
terest therein to Sarah; and that the real estate and capital
stock were transferred by Anne to Miller in fraud of credi-
tors, and are to be sold if Anne does not pay Sarah the sum
of $56,202.72 and interest. No relief was granted against
Maurice Crystal or the banking institutions, but the peti-
tion was not expressly dismissed as to them.

1. Counsel for Anne argue that there was a failure of the
judge within a reasonable time to make a report of the ma-
terial facts found by him, and that such failure requires
that the petition be dismissed. Pertinent dates, all in 1953,
are: entry of decree, March 2; request for report of ma-
terial facts, March 6; appeal, March 20; order to furnish
transcript of evidence, March 24; exceptions to failure to
make report of material facts, December 17; and report of
material facts, December 24. Anne was confined in the
county jail on a writ ne exeat regno from January 29 to
March 2, and on a commitment for contempt from the latter
date until December 15. See *Crystal, petitioner,* 330 Mass.
583. That undue delay is a reproach to the administration
of justice is not to be gainsaid. Some delay here was un-
doubtedly brought about by awaiting the transcribing of
the testimony, as we read in her brief that the transcript of
the evidence was not delivered to the Probate Court until
September 1, 1953.[1] However that may be, we find nothing
in the statutes which, in the event of unreasonable delay in
the judicial process, confers a gratuity upon the appellant
when a respondent, or visits a penalty of dismissal of the suit
upon the equally unoffending petitioner when an appellee.

---

[1] The transcript on appeal consists of 2,190 pages exclusive of exhibits.

The pertinent statute is G. L. (Ter. Ed.) c. 215, § 11, as amended by St. 1947, c. 365, § 3, which reads: "The [probate] judge by whom an order, decree or denial was made shall report the material facts found by him, on request of any party entitled to appeal therefrom made within ten days after such party has notice of such order, decree or denial . . . ." The corresponding statute relating to the Supreme Judicial Court and to the Superior Court reads somewhat differently: "The justice of either court by whom a decree was made, if a written request by any party entitled to appeal therefrom is filed in the office of the clerk of such court within ten days after such party has been notified of the entry of the decree, shall report the material facts found by him within thirty days after the filing of the request as aforesaid or within such further time as the chief justice of such court may grant, upon written request by such justice within said thirty day period . . . ." G. L. (Ter. Ed.) c. 214, § 23, as appearing in St. 1947, c. 365, § 2.

In *Fields* v. *Paraskis*, 318 Mass. 726, 727, it was said that a refusal by a judge to perform his statutory duty under G. L. (Ter. Ed.) c. 214, § 23, might give ground for an exception although there was no remedy by appeal, but there was no intimation that prosecution of the exception might lead to a denial of equitable relief to a plaintiff or a petitioner who had prevailed at the hearing.

2. The Probate Court had jurisdiction of the petition under G. L. (Ter. Ed.) c. 215, § 6, as appearing in St. 1937, c. 257, as amended by St. 1939, c. 194, § 2, which confers jurisdiction "of all matters relative to guardianship and conservatorship." This means all matters cognizable under the general principles of equity jurisprudence relative to the estates of the wards. *Kressler* v. *Flynn*, 323 Mass. 610, 614. The extent of jurisdiction is analogous to that conferred by c. 215, § 6, as to the administration of the estate of a deceased person. "Recovery of property that is a part of an estate presents an issue under this statute. *Mitchell* v. *Weaver*, 242 Mass. 331, 337. See *Coffey* v. *Rady*, 267

Mass. 301." *Hinckley* v. *Barnstable*, 311 Mass. 600, 606. It is further settled that jurisdiction extends to the recovery of money itself and is not confined to stocks, bonds, savings bank books, or unique chattels. *Allen* v. *Moushegian*, 320 Mass. 746, 754.

3. The judge's report of the material facts found by him is expressly made under G. L. (Ter. Ed.) c. 215, § 11, as amended. These we summarize. Sarah was the widow of Samuel Kobrosky, who died on December 20, 1947, survived by four daughters, of whom Anne was unmarried and living at home, and two sons, Louis and Milton. Samuel had successfully engaged in the junk business in Springfield for about fifty years, at first individually and later for a corporation. He accumulated large sums of money which he placed in a safe in a closet of his bedroom at home.

(a) In October, 1949, Sarah received a check for $4,720 in partial distribution from her husband's estate. From this check an initial deposit of $4,000 was made in the Springfield Institution for Savings in the name of Sarah Kobrosky or Anne B. Kobrosky. Later three deposits totaling $1,000 were made, and with interest accumulations the account reached $5,228.46. "All of this money was the property of Sarah." Anne never deposited any money of her own in this account. Her name was on the book for the purpose of making deposits and withdrawals for her mother. Shortly after May 19, 1952, she received a check of the bank for the full amount of the account, and later indorsed it to Miller, who knew it was not Anne's money. Sarah knew nothing of the transaction.

(b) A mortgage in the amount of $15,500 on real estate on Sharon Street stood in the names of Sarah, Anne, and Louis, as joint tenants with right of survivorship. On July 28, 1951, a savings account in their names was opened at the West Springfield Trust Company. The mortgage and the account were the property of Sarah, the other names being used for convenience in handling payments on account of the mortgage. On January 28, 1952, without the knowledge of Sarah or Louis, Anne withdrew the funds in

this savings account, and opened a checking account in the same bank in her mother's name and her own. On May 13, 1952, without authority from her mother she withdrew the balance of the checking account, amounting to $1,952.42.

(c) Samuel had three safes, two at his junk yard, and one in the closet of the bedroom of Sarah and himself. He alone knew the combination of the bedroom safe. He tried to teach Sarah the combination, but she was unable to learn it. He told her that he was saving money for her, and that there was $10,000 for each of the six children. She testified to an amount of $125,000 he told her he was saving for her. "He told her that this money was hers." After Samuel's death the bedroom safe was opened by an expert in the presence of Anne, Louis, and two other sisters. Among other things in the safe were a bag containing old coins, three bags containing $60,000 in bills, jewelry of Sarah, and a small envelope bearing the name of Sarah and containing a key, which "was discovered" to belong to one of the safes at the junk yard. When the key was found, Louis said, "That's the key to the safe in the old office," and Anne said, "That's where Ma's money is." Each of the children received from their mother $10,000 in an envelope purchased by Anne and on which their names were written by Anne. Anne denies handling the money. Title to this $60,000 is not in issue in the case at bar.

About a month after Samuel's death Louis and Anne went to the junk yard where there was a safe in an old office used for storage in which Louis had seen his father put money but never withdraw any. Samuel had told Louis this money was for Sarah. Louis opened this safe with the key found in the bedroom safe. In it was $120,000 in bills in bundles of $10,000 each. These were old bills, some being "the old style large bills," in denominations of $20, $50, and $100. Louis and Anne then put the $120,000 in the bedroom safe, which Anne opened.

"I find on all the evidence and the inferences therefrom that Samuel Kobrosky during his lifetime, made a valid gift of this sum of $120,000 to Sarah Kobrosky."

(d) In June, 1951, Sarah at her home in the presence of Anne purchased from one Kamine four bonds of $5,000 each of the State of Israel. Anne gave instructions to register the bonds in the names of Sarah and Anne. Anne left the room and came back with $20,000 mostly in $20 bills, which were given to Kamine. A few days later at the Kobrosky home four more bonds of $5,000 each of the State of Israel were purchased. Kamine was again paid $20,000, mostly in $20 bills. Anne gave instructions to register these bonds in the names of Louis and Anne, but Sarah was unaware that her name did not appear on them, and did not so intend. The money paid for the bonds was Sarah's. Anne did not contend in the Probate Court that it was her money and in fact denied handling it.

(e) On October 28, 1951, Anne married Maurice Crystal of Montreal, Canada. Two days later Louis and Anne counted the money in the bedroom safe. There was $70,000. Sarah then gave Anne $20,000 to buy a house in Canada. This is in addition to the $10,000 she received from the $60,000 originally in the safe. This sum is not in issue. The evidence failed to account for $10,000, which Sarah may have used to buy bonds for grandchildren or for charitable donations. The remaining $50,000 and $7,775 in United States bonds in the name of Sarah Kobrosky or Anne Kobrosky were put in a safety deposit box in the West Springfield Trust Company by Sarah, Louis, and Anne. The box was in their names.

In December, 1951, Sarah's health began to fail, and she suffered a severe heart attack. In January, 1952, Louis was married in his mother's bedroom and went to Florida. Sarah was confined to her bed during January and most of February. On February 14 Milton and Anne went to the West Springfield Trust Company and counted the money in the safety deposit box which was found to be $47,000. "Milton noted that the bonds of Israel were in the box."

On March 4, 1952, Anne went to the safety deposit box. "I find that on this occasion Anne . . . took" $47,000 in

cash, $40,500[1] in bonds of the State of Israel, and $7,775 in bonds of the United States of America, "the property of Sarah." Anne "took this property without right or authorization."

On March 7 Anne told Milton that she had put the money back in the bank. "I find this statement was untrue." The access record shows her last visit to the box to have been on March 4. On March 7 Louis returned from Florida. On March 10 he went to the safety deposit box but could not open the box because he had no key. On April 10 Sarah found a key on the floor of the bedroom closet. With this key Louis and Milton went to the box and, apart from old deeds and papers, all they found was six $1,000 bonds, four in the names of grandchildren and two in the names of Anne and Sarah.

(f) On March 31, 1952, about 10 P.M. Anne and her husband came to the Kobrosky home. Sarah, who was in bed, awoke and found Anne in her room. Sarah discovered that Anne had the coin collection and Sarah's jewelry, which up to that time had been in the safe in Samuel's bedroom closet. Sarah said, "Put that back." Anne did not do so, but left the house. "I find that on this occasion, Anne had opened the safe in the bedroom closet and took therefrom the coin collection, her mother's jewelry and papers, among which were the stock certificates of Sarah Kobrosky and Louis Kobrosky and other members of the family, including her own, in Samuel Kobrosky & Co., Inc." Later through counsel the jewelry and the stock certificates other than her own were returned.

(g) On May 13, 1952, Anne transferred eleven shares of capital stock in Samuel Kobrosky & Co., Inc., belonging to her and her interest in real estate on Plainfield Street, Springfield, to Miller without consideration. These transfers were in fraud of Sarah's rights as a creditor, and Miller was not a bona fide purchaser for value.

---

[1] There was testimony that Sarah and Anne bought a $500 bond in September, 1951.

(h) There was a relationship of trust and confidence between Sarah and Anne, and Anne violated that trust.

4. In order to effect a completed parol gift there must be a settled donative intention on the part of the donor, together with an actual or symbolic delivery of the subject matter of the gift to the donee or someone in his behalf in such manner as completely to transfer the dominion and control of it in the lifetime of the donor. *Monaghan* v. *Monaghan*, 320 Mass. 367, 369–370, and cases cited. See *Murphy* v. *Killmurray*, 324 Mass. 707, 709. "An intent to give is not a gift; nor is an executory agreement or promise without consideration a gift." *Gerry* v. *Howe*, 130 Mass. 350, 351. *Cardoza* v. *Leveroni*, 233 Mass. 310, 313. Confining ourselves to the $120,000 for the moment, it seems clear that the specific facts stated by the judge preclude a finding of a completed gift of this sum to Sarah in her husband's lifetime. *Marcus* v. *Richardson*, 299 Mass. 11, 13. *Birnbaum* v. *Pamoukis*, 301 Mass. 559, 562. Contrary to her belief, the money was not in the bedroom safe but was in a safe at the junk yard about which she was not found to have any knowledge and which evidently belonged to the corporation. The presence of a key attached to a paper bearing her name in the bedroom safe does not avail. So far as was found, Sarah did not even know of the key which was in a safe to which Samuel alone had access. See *Day* v. *Richards*, 197 Mass. 86. The statements of Louis and Anne when they saw the key are no substitute for the legal requisite of delivery of the money. The three cases relied upon by the petitioner do not assist him. They concern deposits in trust in a savings bank. *Gerrish* v. *New Bedford Institution for Savings*, 128 Mass. 159. *Alger* v. *North End Savings Bank*, 146 Mass. 418. *Buteau* v. *Lavalle*, 284 Mass. 276.

The petition is brought on the theory of a completed gift. The hearing, however, also appears to have proceeded on the theory that Sarah might be entitled to prevail as "bailee in possession under a claim of title" after her husband's death. Strictly speaking, she could not, of course, be a bailee where there was no bailor. We treat this as a con-

tention that Sarah was a person in possession under a claim of title. See *Burke* v. *Savage,* 13 Allen, 408, 409; *New England Box Co.* v. *C & R Construction Co.* 313 Mass. 696, 708–709. But she would not be entitled to bring this suit, which was commenced on June 4, 1952, to reach assets of Samuel's estate. We ourselves find that Milton was appointed administrator of Samuel's estate and his bond approved on February 19, 1948. Title to personal assets vests in the administrator upon his appointment and relates back to the death of the former owner. *Hatch* v. *Proctor,* 102 Mass. 351, 353. *Reardon* v. *Whalen,* 306 Mass. 579, 581. Thereafter only the administrator can maintain an action for the personal property of a deceased person. *Flynn* v. *Flynn,* 183 Mass. 365, 366. *S. S. Pierce Co.* v. *Fiske,* 237 Mass. 39, 41. *Moulton* v. *Commissioner of Corporations & Taxation,* 243 Mass. 129, 131. *Hobbs* v. *Cunningham,* 273 Mass. 529, 534. *Stuck* v. *Schumm,* 290 Mass. 159, 163. As to the original petitioner, her position with respect to the $120,000, if accepted, would be that of an executor de son tort, and the suit could not be maintained on grounds of public policy. *Clabburn* v. *Phillips,* 245 Mass. 47. *Pinner* v. *Temple,* 291 Mass. 406. *McCarthy* v. *Rogers,* 295 Mass. 245, 249. *Gallup* v. *Barton,* 313 Mass. 379, 382–384. See *Alvord* v. *Marsh,* 12 Allen, 603, 605.

The present petition was not brought, and is not now prosecuted, to enforce claims for the benefit of the estate of Samuel. G. L. (Ter. Ed.) c. 230, § 5, as amended by St. 1934, c. 116.

5. The State of Israel bonds, to the amount of $40,000, were purchased with part of the $120,000. Sarah never acquired title to them good against the administrator of Samuel's estate.

There is no finding as to the source of the money used to pay for the remaining $500 in State of Israel bonds. We have been referred to no evidence which would enable us to make a finding that this bond or bonds were paid for by Sarah out of her own funds.

6. The coin collection was never delivered by Samuel to

Sarah so far as the findings are concerned. We have not been referred to any evidence to enable us to find that it was. We are in no position to say that the evidence reported shows that the decree was nevertheless right. *Matter of Loeb*, 315 Mass. 191, 195. *Cohen* v. *Santoianni*, 330 Mass. 187, 190–191.

7. We next discuss the account in the Springfield Institution for Savings. The original deposit of $4,000 was a partial distribution to Sarah in a proper manner from the administrator of Samuel's estate. There is no finding and, except for testimony of Anne that the money was hers, which the judge did not believe, we have been referred to no evidence as to the source of the three later deposits totaling $1,000. The judge's findings are amply supported by the evidence as to $4,000 and interest on that sum. We make no finding as to the balance of the account. The case may be further heard on this point.

8. We now consider the $7,775 in United States savings bonds standing in the names of Sarah or Anne, which the judge found belonged to Sarah and were taken by Anne. The decree recites numbers for seven $1,000 bonds, but there are no facts found supporting these words in the decree. *Carilli Construction Co.* v. *John Basile & Co. Inc.* 317 Mass. 726. There are findings that Samuel had a safety deposit box in the Springfield National Bank; that on December 29, 1947, Louis and Florence Reffe, one of the daughters, found in it "United States Bonds" in the total amount of $25,000; and that these bonds were in various family names, $7,000 being in the names of Samuel and Sarah. We assume that these would pass to Sarah at Samuel's death. Compare *Reynolds* v. *Reynolds*, 325 Mass. 257, 262–263. We might perhaps infer that these are in some way related to $7,000 of the bonds referred to in the decree. We are not referred to any evidence which would enable us to make findings of our own. On a record of this length containing so much conflict in testimony we do not undertake the task. The case should be further heard on this point.

9. One of the allegations of paragraph 9 of the petition is: "The petitioner is also the owner of a real estate mortgage on property located on Sharon Street in said Springfield, wherein the name of said respondent, Anne B. Crystal appears as joint owner thereof." The petitioner contends that Anne cannot object to the decree as to the mortgage because paragraph 9 of her answer reads in part that she "admits the allegation as to the real estate mortgage on property on Sharon Street in said Springfield; this respondent denies categorically all of the remainder of the allegations in the ninth paragraph of the petition." The petitioner evidently relies on such cases as *Bancroft* v. *Cook*, 264 Mass. 343, 348. We cannot accept his contentions. There were many other allegations in paragraph 9 including: "where the name of the respondent, Anne B. Crystal appears as a joint owner or survivor, the petitioner says that said respondent's name was put on said bonds, said accounts and said mortgage solely for the convenience of the petitioner, because of her age and physical impairment and at no time was it ever intended by the petitioner nor understood by any of said parties that said respondent, Anne B. Crystal had any property interest whatsoever in any of said items . . . ." As matter of interpretation, the admission in the answer did not cover the allegations of the petition last quoted.

The findings do not disclose how the mortgage came to be in the joint names of Sarah, Anne, and Louis, but was held in trust for Sarah. From deeds in evidence we ourselves find that Sarah acquired the real estate in 1907 and on August 18, 1950, conveyed it through a straw to Sarah, Anne, and Louis; and that on June 22, 1951, it was conveyed to a church, which gave back a purchase money mortgage to Sarah, Anne, and Louis. We have been referred to no evidence and do not attempt to make more findings relating to the circumstances of this transfer. In order to show Sarah's equitable ownership of the mortgage and the related account in the West Springfield Trust Company from which Anne drew $1,952.42, further find-

ings must be made. We leave that task to the Probate Court.

10. As to the cash item of $47,000, the coin collection, the bonds of the United States, and the bonds of the State of Israel, the case was tried below chiefly on the issue whether Anne had taken them. The evidence amply supports the findings that she did. It is unfortunate that the fact that the administrator of Samuel's estate was not a party may require a new hearing on many issues. We express no opinion whether such administrator should be made a party to these proceedings by amendment. Compare *Cook* v. *Howe*, 280 Mass. 325, 330–331; *Kressler* v. *Flynn*, 323 Mass. 610, 614.

11. The decree is reversed, and the case remanded to the Probate Court for further proceedings in accordance with this opinion.

*So ordered.*