John P. H. CHANDLER, Jr., Administrator d/b/n of the Estate of Madeleine V. Chandler

v.

UNITED STATES of America.

Civ. A. No. 1800.

United States District Court
D. New Hampshire.

July 15, 1959.

Orr & Reno, Concord, N. H., for plaintiff.

Maurice P. Bois, U. S. Atty., Concord, N. H., Rufus E. Stetson, Jr., Department of Justice, Washington, D. C., for defendant.

CONNOR, District Judge.

This is an action by the administrator de bonis non of the estate of Madeleine V. Chandler, for refund of federal estate taxes alleged to have been erroneously paid. The controversy revolves on the question of ownership of 172 common shares of the stock of American Telephone and Telegraph Company and six shares of the stock of Northern Railroad. The plaintiff claims that the stock at all times belonged to him, while the

government's position is that the plaintiff's mother is deemed to have owned the stock at the time of her death.

The plaintiff, John P. H. Chandler, Jr., was born on August 6, 1911. The decedent, Madeleine V. Chandler, his mother, was appointed his guardian by the Probate Court at Rockingham County, New Hampshire, on November 19, 1919. The assets of the ward's estate at the time the decedent was appointed guardian had a value of $19,792.76. The "First Account" filed by the guardian on February 10, 1925, listed as assets $12,875.62 cash, 120 shares of American Telephone and Telegraph stock, 12 shares of Centennial National Bank stock, 6 shares of Northern Railroad stock, and 6 shares of B. & M. preferred stock.

The "Second and Final Account" which the decedent filed as guardian was allowed by the Probate Court on January 14, 1933. This account stated that she then held, as property of the ward, 172 shares of the stock of American Telephone and Telegraph Company, as well as 6 shares of stock of the Northern Railroad.

At the time of the termination of the guardianship in 1933, of the 172 shares of American Telephone and Telegraph Company, 120 were registered on the corporation's books in the name of Madeleine V. Chandler and 52 were registered in her name as guardian for her son.

On March 29, 1933, the 52 shares were transferred on the corporation's books to Madeleine V. Chandler and all 172 shares remained in her name until October, 1948, when registration was transferred to John P. H. Chandler, Jr., a few weeks prior to the decedent's death.

The stock transfer records of the Northern Railroad Company show that six shares were in the guardianship account and that on March 29, 1933, they were transferred to the account of Madeleine V. Chandler. What is said hereafter of the Telephone shares is also true of the Northern Railroad shares.

The plaintiff's position is that since 1933, until October, 1948, his mother held as trustee for himself the 172 shares of Telephone stock and the six shares of Northern Railroad and that at all times he was the beneficial owner of the stock.

■ This court, following Restatement of Conflicts, section 294(2), in order to determine the validity of a trust, will look to the law of the place where the transaction takes place, in this case, Massachusetts. By the law of Massachusetts, a trust may be proven by parol evidence. Peck v. Scofield, 186 Mass. 108, 71·N.E. 109. The plaintiff testified that he turned the stock over to his mother to "keep it" for him, she turning the dividends over to him periodically. This evidence is corroborated by the guardian's final account, listing the shares as property of the ward, together with the fact that there was no evidence tending to show the existence of a donative intention on the part of the plaintiff to make a gift of the shares to his mother. Such an intention is necessary to sustain a gift. Kobrosky v. Crystal, 332 Mass. 452, 125 N.E.2d 385.

■ The most difficult problem in this case is the motive in setting up the trust, testimony regarding which is set forth below.[1] A trust is illegal if set up for the purpose of defrauding creditors. Re-

---

1. R., page 38:
   "A. And at that time I was a college student. I was in college and going around to football games and going here and there and one thing and another. And my idea, I thought it would be a lot safer to have that stock, that American Telephone and Telegraph stock, and the Northern Railroad stock, in the name of my mother rather than in my name in case I got involved in any difficulties or got in any trouble why that there would be some protection to it so I wouldn't be inclined to sell it or give it away or sign it to anybody or have it attached or anything like that.
   "Q. So what agreement, if any, did you then make with your mother? A. Well, that what was in her name would stay in her name, and the rest would be put in her name and she would keep it for me. * * *"
   R., page 69:
   "XQ. Let me put it this way, Mr. Chandler: Why was it that you wanted your mother to hold title to the stock

statement of Trusts, section 63. The comment to this section states that the trust is void if the intent is to defraud "present or *future*" creditors. According to the Uniform Fraudulent Conveyances Act, Mass. G.L. ch. 109A, section 7, "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors."

The testimony of the plaintiff quoted in the footnote shows that he had mixed motives in turning the stock over to his mother. He was as anxious to safeguard it lest he himself spend it foolishly, as he was to keep possible creditors from attaching it. There was no evidence of any creditors at the time the trust is said to have been set up. He was later involved in two divorce proceedings in which financial settlements were made, the details of which are not clear. Upon neither occasion did he disclose his claimed ownership of this stock, but whether settlement was made without regard to his assets is not disclosed in the record. The end result of the agreement of the plaintiff with his mother was to preclude the reaching of this stock by his creditors, present or future.

▉▉ I conclude that this is sufficient to cause the trust to fail for illegality. It must now be determined what are the results of this illegality. Section 63, supra, refers to section 422:

"Where the owner of property transfers it inter vivos upon an intended trust which fails for illegality, a resulting trust does not arise if the policy against permitting unjust enrichment of the transferee is outweighed by the policy against giving relief to a person who has entered into an illegal transaction."

This means that a resulting trust arises unless outweighed by policy reasons. The government in this case has no better standing than the estate of the decedent. It is not in the position of a creditor who has extended credit to Mrs Chandler, relying on her apparent ownership of the stock. The government is a creditor only if the decedent owned the stock, and to say that ownership of the stock depends upon whether the government would be a creditor is begging the question.

Since no creditors of the decedent have been misled, the test of ownership is whether the decedent would prevail in a suit against her by the plaintiff. In such a suit a finding would be required in the light of the son's conduct that the stock was his. There is no evidence to the effect that he in fact defrauded any creditor and while the arrangement between mother and son is not to be commended, his conduct is not such as would warrant the denial of relief to him. See Thompson v. Steinkamp, 120 Mont. 475, 187 P.2d 1018.

The result reached here is consistent with the decision in Estate of Nannie

rather than yourself? A. Well, I was a young fellow. I might have got into some difficulty.

"XQ. You might have got into some difficulty? What sort of difficulty? A. I might have married the wrong kind of a girl.

"XQ. And then what would have happened? A. Well, then she could take some of my money from me.

"XQ. Take some of your money from you? A. Right.

"XQ. And you wanted to keep this stock out of her reach, is that right? A. I wanted to keep what was mine protected as much as possible.

"XQ. To keep it out of anybody else's reach, isn't that right? A. To keep anybody from influencing me in any way and might be taking it away from me. I might have been sold something. I might have sold it and spent it. I might have squandered it.

"XQ. I see. And wasn't it also your purpose to put this stock beyond anybody's reach so that nobody could get it, saying it was yours, was that your purpose? A. I was just trying to be prudent.

"XQ. Can you answer that question, was that your purpose? A. Well, partially."

568

Bartlett Giles, where the court held that certain securities were not part of decedent's estate where the evidence established that decedent held the property for her husband to keep it out of reach of his creditors. The case is reported in paragraph 39,200, Prentice Hall, B.T.A. Memo (1939).

A judgment for the plaintiff will be entered and counsel is directed to submit forthwith a draft judgment which is to include adjustment for attorney's fees and expenses of litigation.