DOROTHY B. EDINBURG *vs.* GOLDA EDINBURG & another[1];
JO-ANN EDINBURG PINKOWITZ & others,[2] interveners.

Suffolk. February 13, 1986. — May 19, 1986.

Present: GREANEY, C.J., BROWN, & SMITH, JJ.

*Gift. Personal Property,* Ownership. *Trust,* Assets of trust, Personal prop-
erty, Segregation of trust assets.

In a probate proceeding to determine the ownership of some sixteen draw-
ings, where the settlor of certain irrevocable trusts repeatedly affirmed
in sworn testimony, in documents submitted to the court, and in private
conversations that transfers of the artwork to the trusts were completed
gifts; where the settlor's elaborate steps to identify and segregate the
gifts to each trust constituted, in the circumstances, a form of symbolic
delivery; where other corroborating conduct of the settlor, including a
pattern of previous gifts of artwork to the trusts, was shown, the judge
was warranted in concluding that the gifts of the drawings to the trusts
were completed, despite the absence of delivery in a purely technical
sense. [204-208]

In a probate proceeding to determine the ownership of certain works of art,
evidence that the settlor of certain trusts acknowledged her practice of
purchasing art in her own name and then subsequently selling it to one
of the trusts, that an invoice from an art gallery indicated that one of
three drawings had been purchased by the settlor for, and with money
from, one of the trusts, and that ten other documents signed by the
settlor confirmed that she had withdrawn funds from the trust to pay for
all three drawings, warranted the judge's conclusion that the settlor had
acquired the three drawings for the trust. [209]

Evidence at a probate proceeding to determine the ownership of a parcel of
Vermont real estate, including a deed of the property to the trustees of
a trust and the accounts of the trust listing the property as a trust asset
and the payment of a town tax as an expense of the trust, warranted the
judge's conclusion that the settlor of the trust had purchased the parcel
for the trust. [209-210]

BROWN, J., concurring, expressed certain views on perjury. [210-211]

---

[1] Joseph M. Edinburg, who died after the commencement of the litigation.
His executors have not been substituted in this case.

[2] John D. Edinburg and Hope Edinburg.

CIVIL ACTION commenced in the Superior Court Department on May 4, 1982.

The case was heard by *Edward M. Ginsburg, J.*, sitting under statutory authority.

*Jeffrey M. Freedman* (*Robert J. Wells* with him) for the plaintiff.

*George S. Abrams* (*Peter J. Sonnabend* with him) for Jo-Ann Edinburg Pinkowitz & others, interveners.

GREANEY, C.J. This phase of the Edinburg litigation concerns the ownership of nineteen pieces of art work and a parcel of real estate in Jacksonville, Vermont. The case was heard and decided by a probate judge of the Middlesex Division pursuant to the orders of assignment and consolidation discussed in *Pinkowitz* v. *Edinburg, ante* 180 (1986). The judge concluded that Dorothy B. Edinburg had either made gifts of or sold the disputed art works to her children's trusts and that the Vermont property was owned by the trust for her daughter Hope Edinburg. We affirm the judgment.

The case arose as follows. Dorothy, as settlor, created on April 3, 1963, three irrevocable inter vivos trusts for the benefit of her three children, John D. Edinburg, Hope Edinburg and Jo-Ann Edinburg Pinkowitz. The original trustees were Dorothy's husband, Joseph M. Edinburg; his sister, Golda Edinburg; and Joseph's uncle, Mr. Joseph Talamo, an attorney. In early 1981, Dorothy and Joseph filed cross complaints for divorce. On May 4, 1982, Dorothy filed an action in the Superior Court seeking the filing by Joseph and Golda, the two remaining trustees,[3] of accounts for each of the trusts; the confirmation of their resignations;[4] and the appointment of a bank or some other suitable corporate fiduciary as the successor trustee. On September 12, 1982, Joseph filed accounts for each of the trusts that covered the period from 1963 through 1979. These submissions listed the assets of each trust as of July 14, 1980, and again as of September 15, 1982. They indi-

---

[3] Mr. Talamo died in 1970.

[4] Joseph and Golda had both resigned as trustees in July, 1980. In their answer to Dorothy's action, they asserted that the information necessary for any accounts was principally in Dorothy's exclusive possession.

cated that Dorothy had withdrawn $33,900 from Jo-Ann's trust[5] but had never accounted for the use of the money. They also indicated that Dorothy had withdrawn $15,400 from Hope's trust[6] and $9,700 from John's trust.[7]

In October, 1982, Dorothy filed objections to the accounts. Insofar as relevant to this case, the objections stated that the nineteen drawings at issue[8] belonged to the trusts, not to her, and that the accounts inaccurately claimed that Dorothy owed money to the trusts. While the matter of the accuracy of the accounts was being litigated, Dorothy simultaneously took the position in the divorce litigation, in testimony under oath, in written documents, and by her conduct, that the nineteen drawings were properties of the trusts by reason of gifts or sales made by her.

On February 16, 1983, Joseph died, terminating the pending divorce complaints. On March 31, 1983, Dorothy's three children intervened in this action.[9] The children accepted the recommended modifications to the accounts and requested that their trusts be managed by an independent trustee. At about the same time, Dorothy sought to reverse her position as to the nineteen drawings, claiming that she had not made gifts of them or sold them to the trusts. Instead, she contended that she had constructed the appearance of gifts and sales in order to keep the art works from falling into her husband's hands

---

[5] The yearly amounts withdrawn by Dorothy from Jo-Ann's trust as listed in the accounting for that trust, were as follows: $7,100 in 1977; $7,000 in 1978; $17,300 in 1979; and $2,500 in 1980.

[6] The yearly amounts allegedly withdrawn by Dorothy from Hope's trust, as listed in the accounting for that trust, were as follows: $4,000 in 1975 for art works; $4,600 in 1976 for "art or loan advance"; $5,000 in 1978; and $1,800 in 1979.

[7] The yearly amounts allegedly withdrawn by Dorothy from John's trust, as listed in the accounting for that trust, were as follows: $1,000 in 1976; $4,100 in 1978; and $4,600 in 1979.

[8] The works of art are drawings by the following artists: Beckmann, Blake, Bresdin, Il Canaletto, Chasseriau, Degas, Goya, Kirchner, Matisse, Monet, Munch, Renoir, G. B. Tiepolo, G.D. Tiepolo, Toulouse-Lautrec, Turner and Villon.

[9] The intervention was with the agreement of all the parties to the lawsuit.

by way of any division of property in the divorce actions under G. L. c. 208, § 34. This reversal led Dorothy to assert that she had committed perjury in prior testimony when she stated under oath that the drawings belonged to the trusts, and to claim that she had falsified documents and made misrepresentations to others in order to deceive the trial court and her husband. Confronted with this situation, the judge conducted a five-day trial, focused primarily on the question of the ownership of the drawings (and, to a lesser extent, on the ownership of the Vermont property), during which he heard the testimony of numerous witnesses and received considerable documentary evidence. Following the trial, the judge entered comprehensive findings of fact and rulings of law,[10] in which he concluded that the nineteen drawings belonged to the children's trusts and that the Vermont real estate was an asset of Hope's trust. The judge then appointed a Boston lawyer, whom he determined to be "an experienced person [and] knowledgeable in

---

[10] The decision filed in this case by the judge runs to thirty-four pages. It contains seventy findings of fact, separate conclusions of law, and a six-page "Discussion" section which sets forth in detail the judge's reasoning process in deciding the case and his view of the credibility and motives of the witnesses, Dorothy, in particular.

In the "Discussion" portion of his decision, the judge made the following comments:

"Although it is possible to support either version of the truth, the court believes that the more credible version by far places the disputed works of art in the three (3) trusts. Dorothy Edinburg seeks to portray herself as just being the victim of her late husband's greed and now as a martyr to the unwarranted assaults by her children to whom she has been generous and whom she dearly loves. She comes across on the witness stand as an extremely clever, manipulative and controlling person. Although she seeks to invoke the sympathy of the court by portraying herself as maintaining the art intact for the ultimate benefit of the students at Wellesley College, she, at the same time, reveals a contempt for the integrity of the court system and a total disregard for any discomfort or embarrassment which she might have caused to her counsel.

"After considering all the statements and actions of Dorothy Edinburg and others, not only from the time of the divorce proceedings, but also from the inception of the three (3) trusts, the court is of the firm conviction that the disputed works of art belong to the trusts."

art and trust law," to act as the permanent trustee of the three trusts.[11]

1. *Standard of review.* The essential questions are whether the judge's findings of fact are clearly erroneous, and, if not, whether they support his legal conclusions that the drawings and the Vermont property belonged to the particular trusts designated as the owners. The nature of the "clearly erroneous" test, which Mass.R.Civ.P. 52(a), 365 Mass. 816-817 (1974), establishes as the standard governing the reliability of findings of fact made by a trial judge, has been stated many times. We see no need to repeat all the principles that make up the definition. See *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 160-161 (1977); *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977); *Simon* v. *Weymouth Agricultural & Industrial Soc.,* 389 Mass. 146, 148-149 (1983); *First Pa. Mortgage Trust* v. *Dorchester Sav. Bank,* 395 Mass. 614, 621 (1985). We emphasize the following three principles that we think have particular relevance to the issues in this appeal. First, the judge's assessment of the quality of the testimony is entitled to our considerable respect because "it is the trial judge who, by virtue of his firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence." *New England Canteen Serv., Inc.* v. *Ashley,* 372 at 675. Second, "[i]f the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [appellate court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson* v. *Bessemer City,* 470 U.S. 564, 573-574 (1985). Third, "[t]he burden is squarely on the appellant to show an appellate court that a finding is clearly erroneous." *First Pa.*

---

[11] This lawyer had been serving as temporary trustee since the resignations of Joseph and Golda. The judge found that "[h]e has performed admirably to the satisfaction of all parties in his capacity as temporary trustee." The judge rejected Dorothy's recommendation of the appointment of a Boston bank as a cotrustee.

*Mortgage Trust* v. *Dorchester Sav. Bank.,* 395 Mass. at 621-622, quoting from *Matter of Multiponics, Inc.,* 622 F.2d 709, 723 (5th Cir. 1980). With these principles in mind, we turn to the discrete questions involved in the appeal.

2. *The question of the gifts of sixteen drawings.* The judge determined that sixteen drawings had been given by Dorothy as gifts to two of the three irrevocable trusts.[12] As a general rule, to sustain a transfer as a gift, there must be evidence of donative intent on the donor's part, combined with evidence of delivery of the property to the donee, or someone acting on the donee's behalf, in a manner that surrenders dominion and control. *Kobrosky* v. *Crystal,* 332 Mass. 452, 460 (1955). *Silverman* v. *A. & L. Heel Corp.,* 353 Mass. 108, 110 (1967).

Whether Dorothy possessed the necessary donative intent was "essentially a question of fact." *Herwitz* v. *Herwitz,* 356 Mass. 734 (1969). In addition to her testimony, under oath, that she had made gifts of the sixteen drawings to the trusts, several independent witnesses testified that Dorothy had made gratuitous and unsolicited statements to her counsel, her husband's counsel, and others that the art works belonged to the trusts. There was evidence that Dorothy had stated to appraisers from Christie's Appraisals, Inc., retained to value each of the drawings, that the art works were the property of the trusts. There was further evidence that she had affixed labels to some of the drawings that indicated their ownership by specific trusts; that she had placed stamps on the mats of other drawings, again indicating ownership by specific trusts; and that she had placed drawings that were of appropriate size in solander boxes,[13] which were marked as containing property of specific trusts. Thus, by means of labelling, stamping, or sequestration in solander boxes, each of the sixteen drawings had been identified as the property of a particular trust. Further, the evidence warranted the judge's finding that, in a meeting with her son John

---

[12] These involved gifts of seven drawings to John's trust and nine drawings to Hope's trust.

[13] A solander box is a special box employed to protect delicate works of art such as the drawings in this case.

in March, 1982, Dorothy directed him to copy down the name of each artist and the title of each drawing given to his and Hope's trusts and other information, so that the ownership of each of the art works by a specific trust would be clear and unequivocal.

Other evidence showed that Dorothy had made gifts of art work to each of the three trusts in the past. This last evidence tended to demonstrate a pattern of giving to her children. Finally, the judge could note that Dorothy's financial statements filed in connection with the divorce litigation did not list the disputed art works as her property. All of the above, which represents a summary of the evidence found credible by the judge, is sufficient to sustain his findings that Dorothy manifested the requisite donative intent.[14]

Dorothy's conduct in effecting gifts by placing the contested art works in the children's trusts, however, makes this a somewhat exceptional case. This is not the typical gift situation, in which physical delivery of the subject matter of the gift by the donor to the donee has clearly occurred. Ordinarily, such a definitive act of delivery confirms that the donor has irrevocably parted with dominion and control over the subject of the gift. Nevertheless, where such actual delivery is impractical, some symbolic or constructive form of delivery may be present and sufficient to warrant a conclusion that a gift has been made. See Brown, Personal Property § 7.5 (3d ed. 1975).

Dorothy points to the delivery requirement and relies primarily on three cases that she claims establish that no form of delivery occurred here.[15] Looking to these cases, she contends

---

[14] The fact that Dorothy had not filed gift tax returns in connection with these drawings is not dispositive of the issue of her donative intent. See *Koufman* v. *New England Merchants Natl. Bank,* 9 Mass. App. Ct. 40, 44-45 (1980); *Schleifstein* v. *Greenstein,* 9 Mass. App. Ct. 344, 351 (1980).

[15] In *Monaghan* v. *Monaghan,* 320 Mass. 367 (1946), the court held that a completed gift had not been made, despite evidence that the decedent, while making a deposit, told a witness that he might not live long and wanted his brother to have the money, and signed an order to the bank to that effect to be kept in a safe deposit box. The court concluded that no gift had been made on the ground that the donee had not been provided with access to the box during the lifetime of the decedent, and had not been

that the children had no key to the vault where the art work was kept and had no precise knowledge of its contents. She further argues that her oral representations to third persons that she had made gifts were insufficient to complete delivery.

Dorothy's arguments overlook the exceptional nature of this case. It is significant here that "[t]angible personal property usually is not placed in a trust." 2A Casner, Estate Planning § 7.1.7 (1985). Without suggesting that traditional concepts of delivery ought to be dispensed with, we think that the judge could properly find a completed gift, despite the absence of delivery in a purely technical sense.

A method of analysis for approaching exceptional gift cases such as this has been formulated as follows: "While delivery is certainly one form of corroborating evidence, it is inappropriate in some situations, and should not be the only acceptable evidence sufficient to corroborate the donee's claim. To insist on delivery as a necessary element of a gift [may be] unreasonable; to state the requirement in terms of the amount of proof necessary to establish the donee's claim, recognizing that delivery is sufficient corroboration in the normal case, is clearly the better approach." Jones, Corroborating Evidence as a Substitute for Delivery in Gifts of Chattels, 12 Suffolk U.L. Rev. 16, 21 (1978). This analysis by no means expresses a novel proposition but has been stated by authorities on the law of personal property and has been previously applied by other courts. (The cases are collected in Jones, 12 Suffolk U.L. Rev., *supra* at 21-25.) In essence, the analysis relies upon the principle that evidence of the donor's words and conduct that is sufficiently strong to corroborate the donee's position that a

___

informed of the gift until after the depositor's death. In *Kobrosky* v. *Crystal,* 332 Mass. 452 (1955), even though a husband told his wife he had been saving for her, and the key to a safe where the money was found was discovered in an envelope bearing her name in another safe to which only the husband had access, the gift was found incomplete because the wife was unaware of the key or the safe where the money was kept. In *Hardy* v. *Finger,* 347 Mass. 779 (1964), a woman, who had since died, had told her cleaning lady that she was depositing money for her and made notations to that effect in her bankbooks. The court found no completed gift in the absence of evidence of delivery of the bankbooks.

gift has been made will safeguard against fraudulent claims and warrant a conclusion by a fact finder that the gift is valid, notwithstanding equivocal or weak proof of delivery.

Significantly, this case need not turn on statements of future donative intent. Dorothy repeatedly affirmed, in sworn testimony, in documents submitted to the court, and in private conversation, that the transfers of the art works to the trusts were indeed completed gifts.[16] Distinguishing this case from more typical situations, including those in the cases relied upon by Dorothy, where the gifts rested largely in parol, is the fact that Dorothy took elaborate steps to identify and segregate the gifts by trust. The acts of placing labels and stamps on the drawings and sequestering them in special containers — all in order to specify the donee trust involved — constitute a form of symbolic delivery. The propriety of such a form of symbolic delivery, where the nature of the property militated against giving physical dominion, was noted by the judge.[17] See Brown, Personal Property, *supra* at § 7.5. See also *Bourgeois* v. *Hurley*, 8 Mass. App. Ct. 213, 219 (1979).

Other conduct by Dorothy corroborates the finding that the gift was completed. She prepared, or caused to be prepared, written documents confirming that she had made the gifts. These documents included a document drawn up at her behest

---

[16] "[C]onsiderable authority [exists] for upholding . . . gifts when the evidence consists of statements made by the donor to third parties, either at the time of or subsequent to the gift, that he has given the chattel to the donee." Jones, Corroborating Evidence as a Substitute for Delivery in Gifts of Chattels, 12 Suffolk U.L. Rev. at 25, citing Mechem, The Requirement of Delivery in Gifts of Chattels and of Choses in Action Evidenced by Commercial Instruments, 21 Ill. L. Rev. 341, 608-609 (1926).

[17] The judge found that "the delicate nature of these works of art on paper and their high value required that the works be kept in safe places, that Mrs. Edinburg was experienced in this respect, that the trustees of the trusts were not experienced in conservation and security matters, that there were no trustees from 1980 on after the resignation of Joseph M. Edinburg and Golda Edinburg, and that Mrs. Edinburg reasonably and logically provided for the safety and security of these works of art." The fact that Dorothy retained the key to the vault is also not significant. The judge could have inferred from the evidence that Dorothy kept other art works that belonged solely to her in the vault and that her retention of the key was designed to give her access to those art works.

by her son John that stated with specificity the gifts made to the trusts for two of the children. Dorothy also filed documents in court to provide evidence of the existence of completed gifts.[18] Moreover, a pattern of previous gifts of art work to the children was shown, as was Dorothy's practice of retaining exclusive control of all other assets of, and income from, the trusts, despite the fact that the undisputed assets and the income were clearly trust property and should have been held by the trustees.

All of these circumstances persuade us that the lack of further objective evidence of Dorothy's relinquishment of control should not be deemed decisive.[19] Although this conclusion makes it unnecessary to deal with the estoppel theories relied upon by the judge as an alternative basis for his decision, our conclusion is fortified by the principle that a court of equity will not look kindly on one who seeks to benefit by his own turpitude.[20] See Caines v. Sawyer, 248 Mass. 368, 374 (1924).

---

[18] These court documents are not to be lightly disregarded. They involved financial statements in the divorce cases. The statements were signed by Dorothy under the pains and penalties of perjury. A written statement, under oath, filed in a court proceeding to the effect that gifts have been completed constitutes an admission that the element of delivery either has been satisfied or will not be disputed by the donor. In many respects, such a statement furnishes more unequivocal proof of the execution of the donor's intention to make a gift than would a mere manual delivery of the subject matter.

The delivery of documents to the donees (or to another on their behalf) and the filing of documents as public court records further differentiate this case from the line of decisions relied upon by Dorothy. Those cases involved undelivered instruments of transfer deemed ineffective because the purported donors could repudiate the gifts simply by destroying or changing the instruments.

[19] We also find sufficient support in the judge's decision for the acceptance of the gifts by the children and see no need to discuss those of Dorothy's arguments that attempt to defeat the gifts for purported lack of acceptance.

[20] What has been said above deals with Dorothy's principal arguments seeking to establish that gifts were not made. Two other points raised by her warrant comment. The first involves extensive reliance on her own contradictory testimony. She claims that the judge has made inconsistent findings, concluding in Edinburg v. Cavers, post 212 (1986), that she committed perjury and falsified documents in the divorce actions, but then concluding in this case that her testimony about the gifts in the divorce actions was truthful. We think she has read the judge's decision too nar-

3. *The question of the sale of three drawings.* There is ample evidence to support the judge's conclusion that Dorothy had acquired three drawings for Jo-Ann's trust.[21] Dorothy acknowledged her practice of purchasing art works in her own name and then subsequently selling them to one of the trusts. The purchase invoice from the foreign gallery which had sold Dorothy the Munch drawing indicates that the drawing was purchased for, and with money from, Jo-Ann's trust. Ten other documents signed by Dorothy confirmed that she had withdrawn funds from Jo-Ann's trust to pay for the three drawings. We see nothing in Dorothy's arguments to negate the probative effect of these documents. The amounts withdrawn by Dorothy from Jo-Ann's trust, see note 5, *supra,* corresponded roughly with the sums which had been paid for the pictures. The judge's finding that the three drawings had been sold to Jo-Ann's trust is not clearly erroneous.

4. *The question of title to the Vermont property.* The same conclusion is true as to the judge's finding with regard to the ownership of the Jacksonville, Vermont, property by Hope's

---

rowly. The judge finds in his decisions only that Dorothy has "admitted" to perjury in earlier proceedings. In this case, the judge carefully avoids placing any considerable reliance on Dorothy's previous testimony, concluding essentially that she is not at all a credible witness. The primary basis of his decision is the other evidence in the case, which we have found is adequate to sustain the presence of the gifts.

Dorothy's second argument purports to find another inconsistency in the judge's findings. She asserts that, in this case, the judge found that the gifts of the drawings were motivated by her love and affection for her children, while in other cases he found her intensely hostile to them. Again, we think she has read the judge's decision too narrowly. Although the judge refers to testimony that the gifts may have been motivated by Dorothy's love and affection for her children, his findings make it reasonably clear that he cannot discern Dorothy's exact motivation. His discussion of her credibility also makes apparent his view that her complex conduct is governed at any given time by her immediate perception of her own best interests. As the judge's decision points out, it is possible to identify a number of motivations for the gifts in this case, among them some measure of love and affection for her children, who scrupulously avoided taking sides in their parents' bitter divorce; her desire to remove the drawings from her husband's potential reach; and her concern, virtually an obsession, with avoiding the payment of estate taxes.

[21] The drawings were by Munch, Beckmann and Matisse.

trust. In addition to Dorothy's testimony that the property was purchased for Hope and at her request, there was evidence (a) that the property was conveyed by deed, at the time of its acquisition on June 4, 1979, to Joseph and Golda as the trustees of Hope's trust; and (b) that the accounts of that trust list the property as a trust asset and indicate the payment of "Jacksonville town tax" as an expense of the trust.[22]

*Judgment affirmed.*

BROWN, J. (concurring). Two less than cosmic thoughts occurred to me as I sifted through this voluminous record. The first is that I wish the needy knew how to put the law to work for them as assiduously as the greedy seem to do. See *Doliner* v. *Brown,* 21 Mass. App. Ct. 692, 698 (1986) (Brown, J., concurring in part and dissenting in part).

Second, why do the poor and the disadvantaged receive different treatment in our courts than the privileged and wealthy? The central figure is this drama, Dorothy B. Edinburg, has admitted committing perjury several times.[1] Cf. *Katz* v. *Commonwealth,* 379 Mass. 305, 316-317 (1979). Given her blatant admission that she had falsified documents and committed perjury in order to deceive the trial court and her husband, I am compelled to conclude that she attempted to manipulate the legal system and make a mockery of our system of justice. Mrs. Edinburg's "conduct constituted both an affront to the court's dignity and a perversion of the court's purposes as an institution for just resolution of legitimate disputes." *Miaskiewicz* v. *Commonwealth,* 380 Mass. 153, 158 (1980).

If Mrs. Edinburg were poor, black or on welfare, I suspect that she would have been prosecuted to the full extent of the

---

[22] Dorothy's other arguments that the judge should have recused himself and that his decision is not the product of his own independent analysis are dealt with in the decision in *Edinburg* v. *Cavers, post* 212 (1986).

[1] Mrs. Edinburg stated under oath, at the trial of the action concerning ownership of the art works, that her sworn deposition testimony concerning the transfer of the art works to the children's trusts had not been true.

law.[2] When will perjury become a crime for such perpetrators as she — lawyers, entrepeneurs, developers, so-called "wheeler-dealers" and the like? See and compare *Commonwealth* v. *Coleman,* 20 Mass. App. Ct. 541, 542-545 (1985), *S.C.,* 397 Mass. 1001 (1986), for an example of how perjury is dealt with in the usual context. It cannot be said often enough that doctors, lawyers, merchants, politicians and other professionals must not be encouraged to believe that there is one standard for them and another for those less advantaged citizens among us.

In the instant case Mrs. Edinburg would have us believe that a lie in the pursuit of wealth is not an indictable offense. Perjury is no less a crime when the objective is fortune rather than freedom. See G. L. c. 268, § 1. See also Nolan, Criminal Law § 601 (1976). How can we still pretend that all persons are treated equally in our legal system? It is a fiction, but we cling to the myth. That old refrain — "Don't do the crime, if you can't do the time" — must have application to persons regardless of race, sex or station in life. See *Commonwealth* v. *Leavitt,* 17 Mass. App. Ct. 585, 597 (1984) (Brown, J., concurring).

---

[2] Moreover, it appears that the trial judge warrantably could have held Mrs. Edinburg in contempt for her conduct in these various proceedings. See, e.g., *Miaskiewicz* v. *Commonwealth,* 380 Mass. 153, 157-158 (1980).