## Hanover Insurance Company *vs.* Treasurer and Receiver General.

No. 08-P-190.

Suffolk. December 10, 2008. - August 3, 2009.

Present: Berry, Smith, & Cohen, JJ.

*Treasurer and Receiver General. Bond,* Limitation of liability. *Bonds. Insurance,* Bond, Misrepresentation, Cooperation by insured, Amount of recovery for loss. *Damages,* Restitution. *Restitution.*

In a civil action, the judge properly found the plaintiff insurer liable on certain employee dishonesty bonds, where the plaintiff failed to demonstrate that the defendant insured, in its bond applications and renewals, made representations that were both inaccurate and material [727-734]; moreover, the defendant acted in good faith and any variation in its estimation of loss did not constitute a failure to cooperate [734-735], and the filing of its proof of loss was timely [735-736]; finally, although the judge used the correct measure of damages in linking the damages calculation to the amount of unrecovered restitution orders in related criminal cases, this court remanded the matter for purposes of recalculating the award to reflect restitution payments that the defendant received after the conclusion of trial [736].

Civil action commenced in the Superior Court Department on May 22, 2000.

The case was heard by *Elizabeth M. Fahey,* J.

*Allen N. David* for the plaintiff.

*James A. Sweeney,* Assistant Attorney General, for the defendant.

Smith, J. The plaintiff, Hanover Insurance Company (Hanover), appeals from an amended judgment entered in the Superior Court in favor of the defendant, the Treasurer and Receiver General (referred to by the parties as the Department of the State Treasurer for the Commonwealth [department]), following a jury-waived trial at which the judge found Hanover liable on certain employee dishonesty bonds (bonds) and ordered payment by

Hanover to the department of approximately $847,191.47 plus interest and costs.

On appeal, Hanover claims that it should be relieved of liability on the bonds because (1) the department made certain misrepresentations on its bond applications and renewals; (2) the department failed to cooperate adequately with Hanover; and (3) the department filed an untimely proof of loss. Hanover also asserts that the judge incorrectly calculated the department's damages. We affirm so much of the amended judgment in favor of the department, but vacate the portion of the judgment awarding damages and remand for a further hearing on the amount to be awarded.

*Background.* We summarize the relevant facts found by the judge and supplement those findings with undisputed facts from the record. In 1993, Hanover issued three employee dishonesty bonds to the department. The bonds provided coverage for losses caused by the dishonesty of any department employee. Each year from 1993 to 1999, the department submitted applications for the bonds, and each year Hanover renewed the bonds.

In February, 1999, the Attorney General's office began an investigation into the possible theft of funds from the department. The investigation determined that a department employee, John Trischitta, stole approximately $6.5 million from the department's unpaid check fund (UCF).[1] Trischitta accomplished the theft by feeding inside information to a third party dummy entity, which then filed claims for the unclaimed checks. The Attorney General's office began its investigation after a bank notified the office that the third party was making suspicious deposits. Ultimately, Trischitta cooperated in the investigation, and the department was reimbursed the full $6.5 million with interest. That amount is not at issue.

With Trischitta's cooperation, the Attorney General's office also discovered, in late February of 1999, that Trischitta was not the only department employee stealing money from the UCF. On or about March 4, 1999, a newspaper published an

---

[1] If a check issued by the department had not been presented for payment within thirteen months, the check was sent to the UCF. If the check remained unclaimed for an additional period of time, the funds were transferred to the abandoned property fund (fund). If the monies were not redeemed from that fund, they were eventually transferred to the Commonwealth's general fund.

article identifying another department employee, Robert Foley, as also being under suspicion for similar thefts from the UCF.[2] Eventually Foley, Trischitta, and other outside persons were found guilty of having taken about $2.7 million from the UCF; restitution orders issued for those amounts. The department gave notice to Hanover of a claim on the bonds on March 19, 1999, submitted a proof of loss on June 30, 1999, and a conforming proof of loss on October 1, 1999.

Hanover refused to make payments on the bonds. On May 22, 2001, Hanover filed a declaratory judgment action seeking a declaration that (1) Hanover was entitled to rescind the bonds because of material representations in the applications regarding the existence of financial controls, and (2) the department had failed to comply with conditions precedent to recovery under the bonds. The department filed a counterclaim seeking a declaration that it was entitled to recover under the bonds.

At trial, employees of both Hanover and the department testified, in addition to Paul Stewart, a fraud examiner with the Attorney General's office, and Foley, who testified about the thefts and the amounts that he stole. By findings of fact, rulings of law, and order of judgment dated June 7, 2006, the judge found in favor of the department and judgment entered accordingly. On January 4, 2007, an amended judgment entered following the department's receipt of additional restitution funds. The amount of damages set forth in the amended judgment was $847,191.87, plus interest since date of the proof of loss (June 30, 1999), and costs. By letter dated December 8, 2008, the parties informed this court that an additional $432,159.70 had been received in restitution funds following the filing of the briefs in this appeal. Further facts will be set forth as necessary.

1. *Misrepresentations.* At trial, Hanover claimed that the department made three misrepresentations in its bond applications which entitled Hanover to rescind the bonds pursuant to G. L. c. 175, § 186. Hanover claimed that the department materially misrepresented that (1) there was independent reconciliation of bank accounts, (2) it had an internal auditor, and (3) there was a

---

[2] The judge found that the department did not have knowledge of these thefts until March 4, 1999, the date the article appeared in the newspaper.

voucher system in place to prevent the unauthorized issuance of checks.

General Laws c. 175, § 186, provides:

> "No oral or written misrepresentation or warranty made in the negotiation of a policy of insurance by the insured or in his behalf shall be deemed material or defeat or avoid the policy or prevent its attaching unless such misrepresentation or warranty is made with actual intent to deceive, or unless the matter misrepresented or made a warranty increased the risk of loss."[3]

Hanover did not claim that the department acted with deceitful intent. Rather, it claimed that the department's misrepresentations increased the risk of loss. Hanover had the burden of proof on that issue. *A.W. Chesterton Co.* v. *Massachusetts Insurers Insolvency Fund*, 445 Mass. 502, 513 (2005). Therefore, Hanover is relieved of its obligation to make payments on the department's claims only if it meets its burden to prove that (1) the department failed to comply substantially with its representations in the bond applications, and (2) the misrepresentations were material in that they increased the risk of loss to Hanover. See *St. Paul Fire & Marine Ins. Co.* v. *Boston Hous. Authy.*, 25 Mass. App. Ct. 6, 12 n.7 (1987). In determining whether a misrepresentation increased the risk of loss, "[a] fact 'must be regarded as material, the knowledge or ignorance of which would naturally influence the judgment of the underwriter in making the contract at all, or in estimating the degree and character of the risk, or in fixing the rate of the premium.' " *Employers' Liab. Assur. Corp.* v. *Vella*, 366 Mass. 651, 655 (1975), quoting from *Daniels* v. *Hudson River Fire Ins. Co.*, 12 Cush. 416, 425 (1853).

In the instant case, as in *St. Paul Fire & Marine Ins. Co.* v. *Boston Hous. Authy.*, *supra*, there can be no doubt that the department's "promissory representations (about the reconciliations of bank statements) [and other claimed misrepresentations] set out in the application[s] for [the bonds] . . . are to be

---

[3]General Laws c. 175, § 186, was amended by St. 2008, c. 376, § 1, which designated the above-quoted paragraph as subsection (*a*) and added a subsection (*b*). The additional language deals with life or endowment policies or annuity contracts and has no application here.

treated as having the general effect of warranties and dealt with in a manner consistent with [G. L. c. 175,] § 186. . . . [The department] was under obligation substantially to comply with the representations made in its behalf . . . . The only possible open question under the cases . . . was whether [the department] substantially complied with its promissory representations." *Id.* at 13-14.

The term "substantial compliance" was defined in *St. Paul Fire & Marine Ins. Co.* v. *Boston Hous. Authy.,* *supra* at 12 n.7, as follows:

> "In [*Houghton* v. *Manufacturers' Mut. Fire Ins. Co.,* 8 Met. 114, 120 (1844)], the Supreme Judicial Court determined that the policy terms relied on by the insurer in that case were representations, which so far as executory 'shall be *substantially complied with*; but not like warranties . . . requiring an exact and literal compliance. It is enough [as to substantial compliance] if these statements, relied on as the basis of the contract, *are made in good faith and without intent to deceive*; that they are substantially true and correct as to existing circumstances, and *substantially complied with,* so far as they are executory and regard the future.' "

Here, the judge ruled that Hanover did not meet its burden to prove both that the department failed to comply substantially with its representations and that the misrepresentations, if any, were material. Hanover challenges the judge's findings, claiming that the department did indeed make material representations and therefore Hanover should be relieved from liability on the bonds.

We address each alleged misrepresentation separately, examining them under the familiar principle that a reviewing court will not set aside a trial judge's "findings of fact unless they are clearly erroneous," but will "independently review the legal standard which the judge applied to those facts." *Jancey* v. *School Comm. of Everett,* 427 Mass. 603, 605-606 (1998), citing *Kendall* v. *Selvaggio,* 413 Mass. 619, 620-621 (1992).

On the issue of claimed misrepresentations, Elizabeth Pearce, the deputy treasurer for cash management at the department, and Melinda Bliss, the senior underwriter of the bonds for Hanover,

testified. Their testimony, not surprisingly, was contradictory, and, at times, they even appeared to contradict their own testimony. The judge's findings of fact were based on Pearce's and Bliss's testimony.

We think that at this point in our analysis of the judge's findings, it is important to emphasize the following three principles that have particular relevance to the issue of the claimed misrepresentations. "First, the judge's assessment of the quality of the testimony is entitled to our considerable respect because 'it is the trial judge who, by virtue of [her] firsthand view of the presentation of evidence, is in the best position to judge the weight and credibility of the evidence.' " *Edinburg* v. *Edinburg*, 22 Mass. App. Ct. 199, 203 (1986), quoting from *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977). "Second, '[i]f the [trial] court's account of the evidence is plausible in light of the record viewed in its entirety, the [appellate court] may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *Edinburg* v. *Edinburg, supra,* quoting from *Anderson* v. *Bessemer City,* 470 U.S. 564, 573-574 (1985). "Third, '[t]he burden is squarely on the appellant to show an appellate court that a finding is clearly erroneous.' " *Edinburg* v. *Edinburg, supra* at 203-204, quoting from *First Pa. Mort. Trust* v. *Dorchester Sav. Bank,* 395 Mass. 614, 621-622 (1985).

a. *Reconciliation.* The bond applications asked annually the following question: "Are bank accounts reconciled monthly by someone not authorized to deposit or withdraw?" The department answered "yes" to that question on each annual application.

The judge found that during the relevant period, the department had a contract with State Street Bank and Trust Company (bank) to provide bank account reconciliation services. The judge further found that the contract with the bank satisfied the department's representation on the bond applications because of the reconciliation services the bank provided.

The judge's finding was supported by the testimony of Pearce and by the detailed description of the bank reconciliation services in the bank's proposal. Pearce testified that the department issued

approximately eight to nine million checks annually, of which more than 99.9 percent were reconciled by the bank. She described the reconciliation system in place at the bank as an "up-front" system.[4]

Hanover claims that although the bank account reconciliation system was used by the department, it did not extend to the checks issued by the UCF, the fund that was the source of the thefts. Hanover asserts this failure demonstrated that the Department was not in substantial compliance.

The judge found, and Hanover does not dispute, that the UCF issued approximately 2,500 checks annually, an amount that was less than one-tenth of one percent of the eight or nine million checks issued annually by the department. As a result, the judge concluded that the fact that the UCF was not under the bank account reconciliation system was "de minimis" and did not affect the department's substantial compliance with its representation that it had a bank account reconciliation system in place by an independent vendor.

Hanover maintains that the judge erred and that *St. Paul Fire & Marine Ins. Co.* v. *Boston Hous. Authy.*, 25 Mass. App. Ct. at 8, controls. In that case, the insured represented in its application for fidelity bonds that its bank accounts would be reconciled monthly by someone not authorized to deposit or withdraw. *Id.* at 7. The insured had twenty-five accounts, twenty-four of which were independently reconciled on a monthly basis. *Id.* at 8. One account, the payroll account, was not reconciled at all, and an employee stole money from that account. *Id.* at 9. The insurer brought an action to rescind the bond based on the insured's

---

[4]Under the "up-front" system, when the department issued a check, it also sent to the bank an electronic file with the necessary information about the check. When the check was presented for payment, the bank compared the check to the electronic file. If they were in agreement, the check would be paid. The judge found that the "up-front" reconciliation system was not the type of bank account reconciliation system that Hanover meant when it used that term in the bond applications. The judge found, however, that Hanover drafted the questions in the bond applications and never stated the type of reconciliation system it sought and, further, never asked the department for additional information about the system used by the department and the bank. Therefore, the judge found that although the department's bank account reconciliation services were not of the type that Hanover intended, it was not a material misrepresentation. The judge's ruling is supported by the record.

misrepresentation in the application that its bank accounts would be reconciled monthly by an independent vendor. The court held that "[t]he fact that there probably was compliance with [the insured's] policy as to all but one of the twenty-five accounts to be reconciled independently on a monthly basis, and continued failure to comply only as to the account handled by [the dishonest employee, the insured's] most complex account, cannot be regarded as substantial compliance with [the insured's] policy or with its promissory representations." *Id.* at 14.

The decision in *St. Paul Fire & Marine Ins. Co.* v. *Boston Hous. Authy.* does not control this issue. There the director of finance and accounting was aware, for a considerable period of time, that independent reconciliations were not being conducted but failed to take any actions. That was not the situation in this matter, as there was no finding that anyone in the department with appropriate authority was aware that the UCF was not the subject of reconciliation services by the bank. Further, the account not reconciled in *St. Paul Fire & Marine Ins. Co. supra* represented one-twenty-fifth of the total accounts that were reconciled, while the total amount of checks issued by UCF was less than one-tenth of one percent of the total amount of the checks issued by the department. Finally, the account from which the money was stolen in that case was described as the insured's "most complex account." *Id.* at 8. There was no evidence in this matter that the UCF was more or less complex than the several other department accounts.

In sum, the representations as to the reconciliation services were substantially true, considering (1) the department's representation, as Hanover has acknowledged, were not made with the intent to defraud; (2) the number of checks issued by the UCF was minute in comparison with the department checks under contract with the bank for reconciliation; (3) there was no blatant disregard of the requirement for reconciliation as was the case in *St. Paul Fire & Marine Ins. Co.* v. *Boston Hous. Authy., supra*; and (4) the department was required to show only substantial compliance, not absolute compliance. Therefore, we conclude that the judge's finding that the department was in substantial compliance with its representation as to the reconciliation system in place was not clearly erroneous.

b. *Internal audit.* One of the questions asked each year on the bond applications was as follows:

> "Is there an internal audit by an Internal Audit Department under the control of an employee who is a public accountant, or the equivalent? Yes No
>
> "If 'Yes,' to whom are the reports rendered?"

The department each year answered "Yes" and listed the State Auditor as its internal auditor.

Hanover claims that the department did not, in fact, have an internal auditor, and there was evidence that if Hanover had known that there was no internal auditor, it would not have issued the bonds, or at a minimum it would have increased the premium.

The judge found that the department made an inaccurate representation that the State Auditor was at all relevant times an internal auditor for the department. The judge ruled, however, that the department's representation relating to the internal audit was not material to Hanover's decision to issue the bonds. The judge's finding is not clearly erroneous because it is supported by the record.

Deloitte & Touche, an accounting firm, conducted annual independent audits of the Commonwealth, including the department. Its reports were sent to the State Auditor. In addition, the State Auditor conducted periodic audits of the department. Bliss evaluated the department's applications for the bonds on behalf of Hanover. She testified that she generally considered five factors in deciding whether to issue the bonds. The second most important factor, according to Bliss, was an outside audit of the department, which Deloitte & Touche performed annually. Less important to Bliss was the presence of an internal auditor. Bliss further testified that at some point during the relevant period she discovered that the internal auditor listed by the department on its application was the State Auditor. She stated, however, that she did not find out until after the relevant period that the State Auditor conducted such audits only every three or four years, and according to Bliss such infrequent audits increased the risk of loss.[5]

---

[5]The judge incorrectly found that Bliss knew during the relevant period that the State Auditor conducted audits every three to four years. It is clear from

Bliss acknowledged that Hanover never inquired about the frequency of the audits by the State Auditor, and never, in its applications or otherwise, informed the department that the internal audits must be done annually. Bliss also testified that the fact that the State Auditor was not physically located in the department did not, by itself, increase the risk of loss.

Based on the record before us, we conclude that the judge's finding that the department's inaccurate representation that there was an internal auditor was not material.

c. *Voucher system.* In response to a question in the application, the department indicated in response to a question that countersignature of checks was not required. The application then asked the following: "If countersignature is not required, briefly describe the type of voucher system in effect to prevent the unauthorized issuance of checks." In its 1993 application, the department answered, "State payment voucher system." In the 1994 through 1998 applications it answered, "State payment voucher system (MMARS)." Hanover claimed that the answer was a misrepresentation because the department's voucher system covered some accounts but did not cover the UCF or other accounts.

The judge found, and Hanover concedes, that MMARS is a voucher system. Because the UCF issued fewer than 2,500 checks annually as compared to the eight or nine million checks issued annually by the department, the judge ruled that the department was in substantial compliance with respect to its answer on the applications as to whether it had a voucher system. There was no error.

2. *Cooperation.* Hanover claims that the department violated its contractual obligation to cooperate with Hanover because the department did not give Hanover a consistent estimate of loss, failed to turn over the complete documents, and instead turned over to Hanover 300 boxes of unindexed and unorganized documents during discovery.[6] The judge disagreed, finding that the

---

Bliss's testimony that she did not discover the infrequency of the audits until after the relevant period had passed. The incorrect finding is not material to our decision.

[6]Section B(4)(d) of the "Crime General Provisions" of the policies require the department to "[c]ooperate with [Hanover] in the investigation and settlement of any claim."

department gave to Hanover all of the pertinent documents in its control, although "not necessarily in good order." As to the last point, the judge found that Hanover waived any argument because it failed to file a motion pursuant to Mass.R.Civ.P. 34(b), as appearing in 385 Mass. 1212 (1982).[7]

The judge found that the department acted in good faith and that any variation in the loss amount did not legally constitute a failure to cooperate. On this record, there was no error.

3. *Timeliness.* Hanover also asserts that the department untimely filed its proof of loss. The bonds require that the department, after discovery of a loss or a situation that may result in a loss, must "[g]ive [Hanover] a detailed, sworn proof of loss within 120 days." Hanover contends that the relevant discovery date is mid-February, 1999, when the Attorney General's office was notified of the suspicious deposits that prompted its investigation of Trischitta. The department asserts that it discovered the relevant loss on March 4, 1999, when the media identified Foley as a person under suspicion. The department gave Hanover its proof of loss on June 30, 1999, within 120 days of a March 4 discovery date, but outside of Hanover's alleged mid-February discovery date. Hanover supports its argument that the department's proof of loss was untimely on the ground that the February discovery of the $6.5 million Trischitta theft created a situation that might result in a loss. As previously noted, however, that amount is not at issue here because those funds were recovered at the time the theft by Trischitta was discovered.

The judge declined to "attribute . . . knowledge of the Attorney General's office to Hanover's insured . . . [and accepted] the testimony that, until the media publication on March 4, 1999, no one in the [department] knew of the losses. Until March 4, 1999 the [department] did not have actual knowledge of its losses; even then the [department] did not know of the amount of the losses, but only knew, as reported publicly by the media, that it had sustained the reported thefts."

The judge's finding that the department did not discover until

---

[7]Rule 34(b) of the Massachusetts Rules of Civil Procedure states, in relevant part: "A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request."

March 4, 1999, that there were additional thefts is supported by the record, in particular by the testimony of Paul Stewart, a fraud examiner with the Attorney General's office, and by deputy treasurer Gerald McDonough. There was no error.

4. *Calculation of damages.* Finally, Hanover complains that the judge miscalculated the department's damages and contends that the net loss, taking into account the recoveries to date, is $166,346.75. The department argues that its net loss is actually $415,031.97.

The judge linked the damages calculation to the amount of the unrecovered restitution orders issued in the related criminal cases. Hanover asserts, however, that this measure is incorrect because the department's proven losses at trial were not equal to the sum of the restitution orders. We conclude that the judge used the correct measure of damages, and the department is entitled to the amount of unrecovered restitution.

Methodology aside, the parties agree that the judgment should reflect the department's receipt of restitution payments made since the conclusion of the trial. That portion of the amended judgment awarding damages to the defendant is vacated, and the case is remanded for purposes of recalculating the amount of the award. In all other respects the amended judgment is affirmed.

*So ordered.*