UNITED STATES of America,
Appellant,

v.

James C. MANNY, and the Bank of New York as Co-Executors of the Estate of Walter Roy Manny, Deceased, Appellees.

UNITED STATES of America,
Appellant,

v.

Robert C. STANLEY, Jr., Colton P. Wagner, and Manufacturers Hanover Trust Co., as Executors of the Estate of James G. Timolat, Jr., Appellees.

Nos. 341, 342, Dockets 80–6049, 80–6059.

United States Court of Appeals,
Second Circuit.

Argued Dec. 19, 1980.

Decided April 1, 1981.

David M. Jones, Asst. U. S. Atty., S. D. N. Y., New York City (John S. Martin, Jr., U. S. Atty., and Peter C. Salerno, Asst. U. S. Atty., New York City, on brief), for appellant.

Kenneth W. Greenawalt, New York City (Windels, Marx, Davies & Ives, and Robert D. Taisey, New York City, on brief), for appellees James C. Manny et al. as Executors, etc.

Colton P. Wagner, pro se (Humes, Andrews, Botzow & Wagner, and George W. Saam, New York City, on brief), for appellees Stanley et al. as Executors, etc.

Before MANSFIELD and NEWMAN, Circuit Judges, and BRIEANT, District Judge.*

BRIEANT, District Judge:

In these cases, consolidated for appeal, the United States sued in the district court to reduce to judgment and collect unpaid federal estate taxes assessed against the respective estates of Walter Roy Manny, deceased, and James G. Timolat, Jr., deceased. The estate representatives had tendered certain U.S. Treasury bonds, known popularly as "flower bonds," sold under provisions which allow their use at par for the payment of estate taxes.[1] Although the

*Honorable Charles L. Brieant, United States District Court for the Southern District of New York, sitting by designation.

1. *See Estate of Watson v. Blumenthal*, 586 F.2d 925, 927 (2d Cir. 1978) which describes these bonds, and their characteristic "blooming" into full face value at death. Bonds were first sold with provisions authorizing redemption at par to pay estate taxes pursuant to an amendment in 1918 to the Second Liberty Bond Act. Initially, flower bonds required a six-month holding period prior to death, but this provision was later abandoned. Authority to issue such obligations was withdrawn by Congress effective after March 3, 1971. The financial gain to the bondholder is measured by the difference between market value and face value on the date of death or subsequent valuation date. Flower bonds redeemed at par in payment of estate taxes must be valued in the gross estate for federal estate tax purposes, at par, including interest accrued to the date of death. [1976] 1 Fed.Est. & Gift Tax Rep. (CCH) ¶ 4220.05; *Estate of Pfohl v. Commissioner*, 70 T.C. 630, 632 (1978). In effect, the Treasury, which would redeem at face value on maturity in any event, suffers whatever financial loss is attributable to having redeemed prior to maturity, decreased by the additional estate tax collected on the stepped up value of the bonds redeemed.

bonds had been accepted, upon further investigation, the Internal Revenue Service ("IRS") assessed a deficiency in each estate and offered to return the bonds.

At issue is whether the flower bonds, purchased in bearer form from third parties, paid for and delivered, but acquired while Manny and Timolat were comatose, through the agency of persons holding powers of attorney to trade in securities, are eligible for redemption at par in payment of federal estate taxes. The district court, 463 F.Supp. 444, held in each case that the bonds were eligible. We affirm.

A brief reference to the facts of the *Manny* case will be sufficient as there is no material factual difference between the two cases. According to the stipulated facts on which the case was tried below, Walter Roy Manny (the "decedent"), at all times a New York resident, had appointed his son and his accountant, H. E. Johnson, as his attorneys-in-fact, pursuant to several written instruments executed in 1971 and delivered in New York, which gave them the broadest possible agency powers with respect to his substantial assets and property, including the discretionary power to buy and sell securities.

On May 27, 1972, at the age of 81, while sojourning in Vermont, decedent suffered a slight stroke. The son visited his father a number of times, and it is stipulated that prior to June 6, 1972, at the suggestion of accountant Johnson, decedent's son recommended the purchase of flower bonds, and decedent, already aware of the advantages of such investments to the moribund, authorized his attorneys in fact to purchase such bonds through the Bank of New York, and authorized the sale of his securities to cover the purchase, as Mr. Johnson might recommend.[2] On June 6, 1972 decedent suffered

a second stroke, stipulated to have been "massive," following which he remained in a comatose condition until his death on June 27, 1972.[3]

Aware that their principal was comatose, the son and Johnson, acting under the powers of attorney, on June 19, 1972 caused the Bank of New York to purchase in the open market in New York, from unknown third parties, $775,000. face amount of United States Treasury Bonds, 3½% due November 15, 1998, which had been issued in bearer form on October 3, 1960. The bonds were paid for and delivered to decedent's account at The Bank of New York on that date.

These bonds, and related series of flower bonds, carried the following legend on their face:

"This bond, upon the death of the owner, will be redeemed at the option of the duly constituted representatives of the deceased owner's estate, at par and accrued interest, if it constitutes part of such estate and the proceeds are to be applied to the payment of federal estate taxes as in said Circular provided." [Referring to Treasury Department Circular 1052.]

Treasury Department Circular 1052 provides in relevant part:

Any bonds issued hereunder which upon the death of the owner constitute a part of his estate, will be redeemed at the option of the duly constituted representatives of the deceased owner's estate, at par and accrued interest to date of payment, *provided:*

(a) that the bonds were actually owned by the decedent at the time of his death; and

(b) that the Secretary of the Treasury be authorized to apply the entire proceeds of redemption to the payment of Federal estate taxes.

---

**2.** We place no reliance on this stipulated conversation. It could not add to or detract from the powers of the attorneys-in-fact after Manny became comatose. No such conversation is claimed to have occurred with respect to Timolat. Whenever possible, Congress has avoided making tax consequences dependent on the parol evidence of interested family members as to the intention of a decedent.

**3.** While Manny is stipulated to have been "comatose," Timolat was incoherent and in a "semi-comatose, disoriented and confused condition." We treat each decedent as having been mentally incompetent to conduct business affairs at the date when his attorneys-in-fact bought flower bonds for his account.

The flower bonds were included in the estate and were submitted for redemption at par and credited towards the estate tax due. Thereafter, following audit and examination of the estate tax return, the Government determined that the flower bonds could not be used at par to satisfy the tax because it found that on the date of the purchase of the bonds, decedent was "in a comatose condition" which "would have, under applicable New York law, vitiated [the Attorneys'-in-fact] power to act for the decedent."[4]

■ Although the Government, in rejecting the bonds for redemption at par in payment of estate taxes, purported to rely on New York law, it argued on these appeals that "federal law," presumably equivalent to the principles found in the Restatement [Second] of the Law of Agency (1958) (the "Restatement"), is the source to which we must turn. The district court did not perceive the Restatement as different from New York law and did not reach the choice of law issue. We think however that unless an inconsistency exists between the bonds and offering circular or some federal statute, on the one hand, and the New York Law of Agency on the other, which inconsistency would invoke the Supremacy Clause of the United States Constitution, the power of the agents here and the meaning of their actions must be determined by New York law. We see no such inconsistency. Ordinarily, title to property, and the issue of whether a decedent "owned" property for estate tax purposes, are determined according to state law, where federal taxing statutes are silent. *Morgan v. Commissioner*, 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 585 (1940); *Aldrich v. United States*, 346 F.2d 37, 38 (5th Cir. 1965); *see Ernest & Mary Hayward Weir Foundation v. United States*, 362 F.Supp. 928, 934 (S.D.N.Y.1973), aff'd, 508 F.2d 894 (2d Cir. 1974). We note that applicable Treasury Regulations, 31 C.F.R. § 306.2(b), provide as to bearer securities such as these bonds that:

(b) A "bearer" security is payable on its face at maturity or call for redemption before maturity in accordance with its terms to "bearer." The ownership is not recorded. Title to such a security may pass by delivery without endorsement and without notice.

■ We conclude accordingly that title passed from the unknown third parties who sold these specific bonds on the public market to the decedents in these cases, as a result of physical delivery with intention to pass title and sell, followed by payment, during the lifetimes of the decedents. This is "actual" ownership, as contrasted with equitable ownership, or ownership based on an executory contract not performed, situations not presented here, but which we believe were intended to be excluded by the requirement of the offering circular that ownership be "actual."

The Government argues that the agency of the holders of the powers of attorney was "terminated or suspended" when their principals became comatose, and accordingly their "purchases of flower bonds were not effective to make the unwitting principals owners of the bonds at the time of their death" (App. Br. p. 15), and that therefore the district court erred in holding that the bonds were redeemable at par in payment of estate taxes.

■ A comatose person is mentally incompetent while his coma continues and we think the law of New York is clear that, when an agent under a power of attorney acts during the mental incapacity of a principal who has not been adjudicated incompetent and for whom no court-appointed committee or conservator has been designated, the act is at most voidable, and not void.

*Bankers Trust Co. of Albany, N.A. v. Martin*, 51 A.D.2d 411; 381 N.Y.S.2d 1001 (3d Dep't, 1976) was an action in which the judicially appointed conservator of an incompetent sued to enforce a contract of sale

---

4. We agree with the Government that the prior acceptance of the bonds did not effect an equitable estoppel or waiver, and that acceptance does not preclude a subsequent challenge to the tender on learning the facts. Appellees' contentions to the contrary are rejected.

made by an attorney in fact for an incompetent person, while the purchasers sued to recover the down payment and their damages. The Court held:

[A]ppellants alleged four separate causes of action which were all predicated on the allegations that John A. Becker, the owner of the real property and the principal for whom the plaintiff Bankers Trust Company of Albany, N.A., as attorney-in-fact, negotiated the contract of sale, was incompetent at the time and, consequently, the contract was a nullity and unenforceable by any party thereto. . . .

. . . On this appeal, appellants claim . . . that Becker, the owner of the property, was incompetent at the time the contract of sale was executed on his behalf by his attorney-in-fact and that his incompetency revoked the power of attorney and that, consequently, the contract of sale was void. . . .

At the outset we note that the principal was never judicially declared to be incompetent and that the appointment of a conservator is not evidence of the incompetence of the conservatee (Mental Hygiene Law, § 77.25, subd. [b]). There is no claim or proof in the record that the principal was incompetent at the time he executed the power of attorney. Even if Becker, the principal, were incompetent at the time the contract was made by his attorney-in-fact, the contract is not void, but only voidable at the option of the principal upon his regaining competency or by some duly authorized representative. A contract and a power of attorney made by an incompetent person prior to formal adjudication are not void, but only voidable and may be ratified and approved by the incompetent person upon recovering his competency or by a duly authorized person on behalf of the incompetent (*Ortelere v. Teachers' Retirement Bd. of City of N. Y.*, 25 N.Y.2d 196, 303 N.Y.S.2d 362, 250 N.E.2d 460; *Verstandig v. Schlaffer*, 296 N.Y. 62, 70 N.E.2d 15; *Finch v. Goldstein*, 245 N.Y. 300, 157 N.E. 146; *Blinn v. Schwarz*, 177 N.Y. 252, 69 N.E. 542; *Merritt v. Merritt*, 43 App.Div. 68, 59 N.Y.S. 357; "Civil Insanity": The New York Treatment of the Issue of Mental Incapacity in Non-Criminal Cases, 44 Cornell L.Rev., p. 76). In *Blinn v. Schwarz* (supra) the court held a deed and a power of attorney executed by an incompetent were not void, but only voidable at the option of the incompetent, his committee thereafter appointed, or his personal representative or heir. The court explained that the rule was adopted to protect the incompetent and to give him the benefit of favorable contracts and to relieve him from burdensome contracts. At page 263, 69 N.E. at page 545, the court said:

"We think the rule laid down by these cases is sound, and in the interest of those afflicted with disease of the mind. The deed of a lunatic is not void, in the sense of being a nullity, but has force and effect until the option to declare it void is exercised. The right of election implies the right to ratify, and it may be greatly to the advantage of the insane person to have that right. If the deed or contract is void, it binds neither party, and neither can derive any benefit therefrom, but, if voidable, the lunatic, upon recovering his reason, can hold on to the bargain if it is good, and let go if it is bad. This option is valuable, for it gives him the power to do so as he wishes, and to bind or loose the other party at will." 51 A.D.2d at 412–13; 381 N.Y.S.2d at 1002–03.

▮ We find no New York case holding that a non-party to such a contract could assert voidability and disaffirm. In *Bankers Trust, supra*, it was the other party to an executory contract, not the incompetent or his legal representative, who tried to disaffirm the transaction. Under *Blinn v. Schwarz*, 177 N.Y. 252, 69 N.E. 542 (1904), cited in *Bankers Trust*, quoted above, he was not entitled to do so because disaffirmance is solely the right of the incompetent or his legal representative. The sellers of the bonds in this case could not disaffirm the transaction. *See Estate of Pfohl v. Commissioner*, 70 T.C. 630 (1978) reaching the same result, applying New York law.

The Government relies on *In re Berry's Estate*, 69 Misc.2d 397, 329 N.Y.S.2d 915 (Surr.Ct.Queens Co.1972), an accounting proceeding in which beneficiaries of an estate sought to recover funds which decedent's niece, acting under a power of attorney, had transferred, during the lifetime of the decedent, to a trust account for the benefit of the niece's mother. The Surrogate allowed an amendment of the objections to allege that this transfer, which was voidable anyway for self dealing and as *ultra vires*, occurred while the principal was incompetent. In doing so, he held that "if the objectors prove that at the time of the agent's transfer of the funds, and thereafter, that the decedent was mentally incompetent or incapacitated by reason of her alleged comatose or semi-comatose state, then the agency would have been suspended or revoked." 69 Misc.2d at 400; 329 N.Y. S.2d at 918. The Surrogate cited the first *Merritt* case, *Merritt v. Merritt*, 27 A.D. 208, 50 N.Y.S. 604, as the "leading case in New York on the proposition that insanity suspends an agency," 69 Misc.2d at 399, 329 N.Y.S.2d at 917, but did not refer to the second *Merritt* case, relied on in *Bankers Trust, supra*, and reported at 43 A.D. 68, 59 N.Y.S. 357, which limits the scope of *Merritt I*. Nor did he cite *Blinn v. Schwarz, supra*. To the extent *Berry* may be read to hold that the act of an attorney in fact whose principal has become mentally incompetent is "void" rather than merely voidable, we agree with Judges Duffy and Conner that it is not a correct statement of the law of New York on this subject. *See also Meacham, Law of Agency* § 135 (2d ed. 1914), citing *Merritt II* and *Blinn v. Schwarz, supra*.

■ The Government here, like the Court in *Berry*, relies heavily on general statements of law in the Restatement (Second) of Agency (1958) to the effect that incompetency of the principal "deprives the agent of capacity." Restatement § 122, comment (d) suggests that an agent does not necessarily lose authority to act for the principal where the principal is incapacitated by "temporary mental or physical illness." The difficulty with the Restatement analysis is that at the time of acting the agent cannot tell whether the incapacity will be temporary or permanent. Even in these cases, decedents could have recovered from their comatose conditions and survived. We are persuaded that the Restatement provisions are best construed as depriving agents of capacity only where the incapacity of their principals is known to be permanent from the outset; mental or physical incapacity which does not preclude recovery should render the interim acts of the agent voidable rather than void. This reading is wholly consistent with the weight of New York cases in point and preserves the salutary principle that those temporarily unable to act for themselves should be able to benefit from favorable acts which their agents take during their incapacity. Nor are we certain that the Restatement's analysis would express a federal common law rule. As was held by the late Judge Knight, in the pre-*Erie* case of *Beale v. Gibaud*, 15 F.Supp. 1020, 1027 (W.D.N.Y.1936):

> [I]t is claimed that the contract of an insane person is absolutely void and that no one can obtain any rights by virtue thereof. It is said that the federal rule is that a contract of a person of unsound mind is void and not voidable, and support for this contention is claimed to be found in the early case of *Dexter v. Hall*, 15 Wall. (82 U.S.) 9, 20, 21 L.Ed. 73 [1872].

After a detailed analysis of *Dexter v. Hall* and subsequent state and federal cases, Judge Knight held:

> While we do find the broad assertion in the foregoing cases and some other federal and state cases that a contract made by an incompetent is absolutely void, it is quite clear that this is contrary to the great weight of authority today as is evidenced by many opinions and the textbooks of many well-known authorities on the subject of contracts.

> The rule which finds support in many of the authorities today is stated as follows: "While some confusion has arisen by reason of the misuse of the terms

'void' and 'voidable', and some cases have asserted that the contract of an insane person, who has not been so judicially adjudicated, is absolutely void, and not merely voidable, the general rule, supported by the weight of the authority, is that a contract of an insane person, who has not been so judicially adjudicated, is not absolutely void, but voidable." 32 C.J. § 501(c), p. 729.

Black on Contracts (2d Ed.), vol. 2, p. 255; Elliott on Contracts (Accumulative Supp. 1913–1923), § 3820; Page on the Law of Contracts, Supp. 1919–1920, § 1634 et seq.; Bishop on Contracts, § 873; Kent's Commentaries, vol. 2, 451; Chitty on Contracts (18th Ed.), p. 158, by MacFarland & Ragman; all, in effect, declare that the doctrine that conveyances by an insane person are absolutely void is against the "immense preponderance of authority. They are voidable where the person has not been judicially declared incompetent." It is recognized that the insane person may affirm by acts after becoming sane or by failure to disaffirm for a long period of time after becoming sane.

*See also Kevan v. John Hancock Mut. Life Ins. Co.*, 3 F.Supp. 288 (W.D.Mo.1933); *Luhrs v. Hancock*, 181 U.S. 567, 21 S.Ct. 726, 45 L.Ed. 1005 (1901).

 The Government argues, correctly we think, that its rights in the matter should not be affected by any subsequent "ratification" on the part of the executors following death. Although New York cases do seem to speak in terms of "ratification," a voidable contract does not require ratifi-cation to come into existence, rather it requires disaffirmance before its existence may be extinguished. A purported act of ratification may preclude a later disaffirmance, but regardless of what the executors did, or did not do, we conclude that at the time of death Manny and Timolat owned legal title to and had possession of the bonds, subject at most to a right to disaffirm upon recovering from their comatose condition, which right later passed to the executors. They could lose the right to disaffirm by inaction, or by action, such as presenting the bonds in decedent's name for redemption, but it is misleading to call such action ratification.

We note that there is no federal requirement in the Treasury Regulations or in the offering circular or elsewhere that in order for bonds to be submitted at par in payment of estate taxes, purchase of the bonds must have been effected of decedent's own volition. Rather, all that is necessary is that he shall have been the actual owner of the bonds, and that the bonds shall have been includable in his estate for federal estate tax purposes.[5] Both requirements are satisfied in these cases.

The judgments appealed from are affirmed.

---

**5.** Applicable Treasury Regs. found at 31 C.F.R. 306.28(b) contemplate redemption of: (i) Bonds held in joint ownership with another person or persons to the extent included in the decedent's estate for federal estate tax purposes; (ii) Bonds held at the time of death in a partnership in which a decedent had an interest to the extent of his fractional share so held proportionate to his interest in the partnership assets included, in the decedent's estate for federal estate tax purposes; and (iii) Bonds held in trust at the time of the decedent's death, to the extent the trustee is required to pay the decedent's Federal estate tax under the terms of the trust or otherwise.

Obviously, any one of the joint owners of cash or personal property may exchange same for bearer bonds, perfecting title thereby in the same joint ownership as the property or money so exchanged, even if the co-owner were comatose. And the coma of a partner does not necessarily dissolve a partnership, nor prevent the other partners from investing partnership property in bearer bonds, any more than the incompetency of a beneficiary would limit the investment powers of a trustee. If Congress or the Treasury had wished to prevent purchases by or for the account of moribund persons either could have done so by express provision.