ESTATE OF MURIEL W. SAUNDERS, DECEASED, CAROLYN S. WENDELER, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Saunders v. Commissioner
Docket No. 1452-85
United States Tax Court
T.C. Memo 1989-537; 1989 Tax Ct. Memo LEXIS 537; 58 T.C.M. (CCH) 282; T.C.M. (RIA) 89537; September 28, 1989
*537 Son, fearing that his ex-wife and children might take his house from him, inspired a series of deeds to the house to and from his parents and attorney. His mother (decedent) was the last transferee in this series of deeds to the house; she allowed her son to continue to live there. Some 13 years after the last of the transfers, decedent died. She still had title to the house, and her son still lived there. Decedent left the house to her son in her will. Held: The value of the house is includable in the value of decedent's gross estate. Sec. 2033, I.R.C. 1954. Dennis H. Marlowe and Thomas V. McLaughlin, for the petitioner. Kevin M. Flynn, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined a deficiency in Federal estate tax against petitioner in the amount of $ 43,118.98. The issue for decision is whether the value of certain property is includable in the value of decedent's gross estate under section 2033. [1]
FINDINGS OF FACT Some of the facts have been stipulated; the stipulations *538 and the stipulated exhibits are incorporated herein by this reference. When the petition was filed in the instant case, Carolyn S. Wendeler (hereinafter sometimes referred to as "Wendeler"), the executrix of the Estate of Muriel W. Saunders, resided in Old Lyme, Connecticut. Decedent's estate was administered by the Old Lyme Probate Court. As of the date of her death, decedent resided in Old Lyme. Decedent was born on August 8, 1904, and died on March 23, 1982. Decedent was married to Shirley A. Saunders, Sr. (hereinafter sometimes referred to as "Senior"), who died on August 5, 1975. They had two children, Shirley A. Saunders, Jr. (hereinafter sometimes referred to as "Junior"), and Wendeler. Decedent, Senior, and their children lived at 5 Halls Road in Old Lyme (hereinafter sometimes referred to as "5 Halls Road"). From his childhood on, Junior was of frail health and suffered from a serious case of diabetes. Next door to 5 Halls Road, Senior ran an automobile repair garage and sales agency. Junior worked at the garage, and took over running it in the early 1970s. With Junior at the helm, the garage became much less successful and was eventually closed. After about 1 year *539 of not working, Junior went to work as a janitor at the nearby post office, happy to have work that was less mentally demanding. On October 1, 1955, Junior married Nancy Dill (hereinafter sometimes referred to as "Dill"). Junior and Dill had three children. In 1956, Senior bought a tract of land located at 9-1A Halls Road in Old Lyme (the land at 9-1A Halls Road and the house built on it are hereinafter sometimes referred to as "9-1A"). In 1957, Junior and Dill contracted with a builder to construct a house on 9-1A. Junior paid more than $ 25,000 for the construction of the house, financed in part by a mortgage loan from Frank Johnson. When the work was completed in 1958, Junior and Dill resided in the house. On October 10, 1958, Senior transferred 9-1A to Junior by warrantee deed reciting consideration "of One Dollar and other valuable considerations" (hereinafter sometimes referred to as "the usual consideration"). Later, Junior and Dill began to experience marital difficulties, and Dill moved out of 9-1A. On March 29, 1967, Junior transferred 9-1A back to Senior by warrantee deed reciting the usual consideration. On March 31, 1967, Dill initiated an action for divorce against *540 Junior in the Superior Court for New London County, Connecticut. On the same date, Dill filed a certificate of attachment against all right, title, and interest which Senior and Junior had in 9-1A. On April 3, 1967, Dill released the attachment. On the same date, Senior transferred 9-1A to "RALPH DUPONT, TRUSTEE" by warrantee deed reciting the usual consideration. Ralph Dupont (hereinafter sometimes referred to as "Dupont") was Junior's attorney in connection with Junior's divorce from Dill and in connection with Junior's quit-claim of 9-1A to decedent, discussed infra. Junior and Dill were divorced on December 3, 1968, by judgment of the Superior Court of New London County. The Superior Court's divorce decree granted custody of their minor children to Dill, ordered Junior to pay $ 8,000 to Dill in lieu of alimony and $ 20 per week per child for child support, and ordered Dill to quit-claim 9-1A to Junior. Junior was ordered to procure a release of Dill from any liability on their note to Frank Johnson. On January 16, 1969, Dupont (as "TRUSTEE") quit-claimed 9-1A to Junior by deed reciting the usual consideration. The deed was recorded at 12:00 noon on June 4, 1969, and was stamped *541 "No Conveyance Tax collected" by the Town Clerk of Old Lyme. Despite the recited consideration, Junior did not pay any money to Dupont for 9-1A . On January 29, 1969, Dill quit-claimed 9-1A to Junior by deed reciting the usual consideration. The deed was recorded at 12:01 p.m. on June 4, 1969, and was stamped "No Conveyance Tax collected" by the Town Clerk of Old Lyme. Despite the recited consideration, Junior did not pay any money to Dill for 9-1A . On June 2, 1969, in an effort to remove 9-1A from the reach of Dill and the children of Junior and Dill, Junior quit-claimed 9-1A to decedent by deed reciting the usual consideration. The deed was recorded at 12:02 p.m. on June 4, 1969, and was stamped "No Conveyance Tax collected" by the Town Clerk of Old Lyme. Despite the recited consideration, decedent did not pay any money to Junior for 9-1A. This quit-claim deed provides, in pertinent part, as follows: I, SHIRLEY A. SAUNDERS, JR., * * * hereinafter referred to as the Releasor, for divers good causes and considerations thereunto moving, especially for One ($ 1.00) Dollar and other good and valuable considerations, received to my full satisfaction of MURIEL W. SAUNDERS, * * * *542 hereinafter referred to as the Releasee, have remised, released, and forever quit-claimed, and do by these presents, for myself, and heirs, justly and absolutely remise, release, and forever QUIT-CLAIM unto the said Releasee, her heirs and assigns forever, all such right and title as I, the said Releasor, have or ought to have in or to a certain piece or parcel of land, together with the buildings and improvements thereon, * * * [description of 9-1A] TO HAVE AND TO HOLD the premises unto her, the said Releasee, and to her heirs and assigns, to the only use and behoof of the said Releasee, her heirs and assigns forever, so that neither I, the said Releasor, nor any other person or persons in my name and behalf, shall or will hereafter claim or demand any right or title to the premises or any part thereof, but they and every of them shall by these presents be excluded and forever barred. Decedent allowed Junior to continue to live at 9-1A. The only other person who lived at 9-1A at any time after June 2, 1969, was Ed Bennelli, a friend of Junior's, who stayed with Junior for a few months. Decedent never lived in 9-1A and never rented 9-1A to anyone. Decedent executed her will on July *543 17, 1979. In the will, she appointed Junior and Wendeler as coexecutors. As to 5 Halls Road and 9-1A, the will provides as follows: THIRD: I give, devise and bequeath to my son, SHIRLEY A. SAUNDERS, the real estate owned by me in the Town of Old Lyme, County of New London and State of Connecticut, bounded by the Lieutenant River, known as 91 A Halls Road, together with the house thereon and contents therein, and which real estate was formerly owned by my said son, SHIRLEY A. SAUNDERS. In the event my son, SHIRLEY A. SAUNDERS, does not survive me, I give, devise and bequeath the real property herein described to my daughter, CAROLYN S. WENDELER. FOURTH: I give, devise and bequeath to my daughter, CAROLYN S. WENDELER, the real estate owned by me in the Town of Old Lyme, County of New London and State of Connecticut, bounded by the Lieutenant River, known as 5 Halls Road, together with the house thereon and contents therein. In the event my daughter, CAROLYN S. WENDELER, does not survive me, then and in that event, her husband, ERNEST O. WENDELER, shall have the use of the aforesaid real property for and during the term of his natural life. Upon the death of ERNEST O. WENDELER, I *544 give, devise and bequeath the real property hereinbefore described to my son, SHIRLEY A. SAUNDERS. Decedent devised and bequeathed the residue of her estate in equal shares to Junior and Wendeler. If either Junior or Wendeler were to die before decedent, then the survivor would take all of the residue. If both Junior and Wendeler were to die before decedent, then the residue would go to certain named charities. Andrew Brand drafted decedent's will. Thomas McGarry drafted a codicil to decedent's will, by which decedent intended to keep her property (other than 9-1A and 5 Halls Road) away from Dill and the children. Dennis H. Marlowe (hereinafter sometimes referred to as "Marlowe"), co-counsel for petitioner in the instant case, also represented petitioner in the administration of the estate in the Probate Court. Junior did not have confidence in any attorney, and especially not in Marlowe. Decedent's estate tax return shows a total gross estate of about $ 339,000 (of which $ 140,000 is the value of 5 Halls Road), deductions of about $ 39,000, and a taxable estate of about $ 300,000. The tax return describes 9-1A, but does not include the value of 9-1A in the taxable estate. The *545 alternate valuation date was elected on the estate tax return. The value of 9-1A on the alternate valuation date was $ 140,000. Junior died on July 2, 1984. Junior's will, executed June 24, 1984, appoints Wendeler and her husband as coexecutors. The will gives 29/30 of Junior's estate to Wendeler and the other 1/30 to Junior's and Dill's daughter. A chronological summary of the important events as they relate to the transfers of 9-1A is set forth in table 1. Table 1 Date
Event
1.  1956
Senior buys 9-1A
2.  Oct. 10, 1958
Senior to Junior
3.  Mar. 29, 1967
Junior to Senior
4.  Mar. 31, 1967
Dill writ of attachment
5.  Apr. 3, 1967
Dill releases attachment
6.  Apr. 3, 1967
Senior to Dupont
7.  Jan. 16, 1969
Dupont to Junior
8.  Jan. 29, 1969
Dill to Junior
9.  June 2, 1969
Junior to decedent
10. Mar. 23, 1982
Decedent dies, leaving
9-1A to Junior in her will
11. July 2, 1984
Junior dies
* * * When Junior quit-claimed 9-1A to decedent, Junior and decedent did not have an understanding that Junior would remain the true owner of 9-1A and decedent merely would be the holder of bare legal title to 9-1A. OPINION Petitioner contends that, although decedent had legal title to 9-1A, she held it in constructive trust, *546 or otherwise, for Junior. [2] Thus, petitioner contends, decedent had no interest of value in 9-1A when she died and so no value of 9-1A is includable in the value of decedent's gross estate. [3]
Respondent argues that decedent owned 9-1A in fee simple absolute, maintains that there was no constructive trust and Junior did not have any other interest in 9-1A at decedent's death, and concludes that the entire value of 9-1A in includable in the value of decedent's gross estate. We agree with respondent. The value of decedent's gross estate includes, under sections 2031(a)[4] and 2033, [5] the value *547 of all property to the extent of her interest therein at the time of her death. The value of the gross estate includes the value of all property "beneficially owned by the decedent at the time of his death." Sec. 20.2033-1(a), Estate Tax Regs. Property in which decedent does not have beneficial ownership is not includable in decedent's gross estate, even if decedent had legal title to the property. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1224 (1987). Generally, for purposes of the estate tax, we first determine the legal interests and rights created under State law [6] and then decide whether the interests and rights so created (regardless of the names given thereto by State law) are sufficient to justify including the property in the gross estate. Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940); United States v. Manny, 645 F.2d 163, 166 (CA2 1981); Estate of Pfohl v. Commissioner, 70 T.C. 630, 633 (1978). Neither side contends that this general rule should not apply to the instant case. Cf. Estate of Pfohl v. Commissioner, 70 T.C. at 633-634. Nor is there any dispute with the proposition that it is Connecticut law that controls decedent's legal interests and rights *548 with respect to 9-1A. Cf. Weingarten v. Commissioner, 38 T.C. 75, 78-79 (1962). Both sides find support in parts of the record. We conclude, on the basis of the preponderance of the evidence, that decedent was the owner of 9-1A *549 and not merely the holder of bare legal title to it. Accordingly, we conclude that the value of 9-1A is includable in the value of decedent's gross estate. We consider the more important factual elements as follows: Form of Transfer
In form, Junior quit-claimed to decedent "all such right and title as I * * * have or ought to have" in 9-1A on June 2, 1969. The quit-claim deed recites that "neither I * * * nor any other person or persons in my name and behalf, shall or will hereafter claim or demand any right or title to the premises or any part thereof, but they and every of them shall by these presents be excluded and forever barred." In form, decedent devised to Junior "the real estate owned by me [i.e., 9-1A] * * * and which real estate was formerly owned by my said son" in decedent's will, when she died, on March 23, 1982. This form is consistent with respondent's position (that decedent owned 9-1A in fee simple absolute at her death) and directly contradicts petitioner's position (that Junior retained an interest in 9-1A and transferred only bare legal title to decedent).
Purpose of Transfer
Junior quit-claimed 9-1A to decedent in an effort to remove 9-1A from the reach of Dill *550 and the children of Junior and Dill. If Junior had retained the beneficial ownership of 9-1A, then Dill (or the children of Junior and Dill) could reach 9-1A for alimony or child support due. Dill and the children would be prevented from reaching 9-1A only if we were to assume that decedent -- as well as the witnesses who testified in the instant case -- would have lied about the transfer and denied that Junior was the sole owner of 9-1A. On the other hand, if Junior transferred his right (as well as his title) to decedent, then it appears that Junior's objective might have been obtained. Thus, this aspect of the case is consistent with respondent's interpretation, but does not fit well with petitioner's interpretation. Further, if decedent and Junior were merely dissembling with regard to beneficial ownership of 9-1A, as petitioner contends and as petitioner's witnesses testified, then why would decedent continue this charade in her will? After all, when decedent died, 9-1A would go to Junior anyway and would be available to satisfy claims of Dill, the children of Junior and Dill, and any other putative creditors of Junior. At that time, the most plausible dissembling would be *551 of no effect. Decedent, in her will, might just as well have acknowledged that she held only bare legal title to 9-1A (if, indeed, that had been her agreement with Junior). Instead, decedent's will devises 9-1A to Junior (rather than acknowledging his continuing ownership) and takes the trouble to state that decedent owns 9-1A and that Junior "formerly owned" 9-1A. This suggests that, notwithstanding the testimony of petitioner's witnesses, decedent did not believe that she held only bare legal title to 9-1A. Equal Division of Decedent's Estate
Decedent's will appears to provide for equal treatment of her two children, Junior and Wendeler. Taking into account the values shown on the estate tax return and the estate's deductible expenses, each of the children would receive assets worth about $ 220,000, less half the estate taxes. (Reported taxable estate of about $ 300,000, plus $ 140,000 value of 9-1A equals $ 440,000; half is $ 220,000; estate taxes reduce these amounts.) However, if Junior already owned 9-1A, then he received from decedent assets worth only about $ 80,000, in contrast to Wendeler's $ 220,000 (each less half the estate taxes). Thus, petitioner's interpretation *552 seems to be inconsistent with an intent by decedent to treat her children equally in her will. On the other hand, respondent's interpretation is consistent with an intent by decedent to treat her children equally in her will. Who Acted as Owner -- General
On brief, petitioner states that Junior "maintained continuous possession of that property; he made repairs and improvements and he exercised complete dominion and control over it. [Decedent] exercised none of the rights ordinarily attendant on property ownership." We have found that, for the 13 years between the June 2, 1969, quit-claim deed and decedent's death, Junior was the sole resident of 9-1A (except for a few months when a friend of Junior's stayed there). There is also testimony by Wendeler that Junior "had it painted, had new rugs put in the place and he cared for it. He spent a lot of time in it while my mother prepared his meals and things like that, he would always go back to his own house." This clearly is consistent with petitioner's contention that Junior was the beneficial owner of 9-1A. However, it is also consistent with respondent's contention that decedent had full ownership. We do not regard it as unusual *553 for a mother to allow her son to live in a house that she owns, especially if her son's presence does not interfere with any other use she intends to make of the house. We do not regard it as unusual that, over a 13-year period, a son would have his lodging painted, put new rugs in the place, and care for the place, especially if his mother continues to prepare his meals. We conclude that the foregoing does not advance either side's cause. Who Acted as Owner -- Taxes and Insurance
On answering brief, petitioner states that decedent did not pay the taxes or insurance on 9-1A. Petitioner does not direct us to any item in the record that would support that factual statement, and we have not found any such item. Petitioner has not proposed any finding of fact as to who paid the taxes or insurance on 9-1A. If decedent did pay the real estate taxes and insurance on 9-1A, then that would suggest that decedent owned the beneficial interest as well as the title to 9-1A. The same would be true if decedent deducted the real estate tax payments on her income tax returns. It would seem that evidence on this matter would be more easily available to Wendeler than to anyone else, because of *554 her role as executrix for both decedent's estate and Junior's estate. Under these circumstances, especially since petitioner brought the matter up and seemingly seeks to profit from the absence of evidence in the record, we point out that the absence of such evidence in the record suggests that decedent did pay the real estate taxes and insurance on 9-1A, and did deduct the real estate tax payments on her income tax returns. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (CA10 1947). Oral Statements
There was much testimony as to oral statements by decedent and Junior to the effect that Junior still owned 9-1A and that decedent would reconvey 9-1A to Junior when Junior wanted her to do so. These oral statements by decedent and Junior are central to petitioner's case and conflict with respondent's case. Conclusions
Respondent's case does not adequately explain decedent's and Junior's oral statements as to ownership. Petitioner's case does not adequately explain the form of Junior's transfer to decedent, except to suggest that Junior acted irrationally. Of course, petitioner's case depends on persuading us that Junior's transfer was *555 ineffective for Junior's asserted purpose, and thus that Junior's actions were irrational. Decedent's actions are consistent with respondent's theory and not with petitioner's. If decedent had believed that 9-1A was still Junior's property in substance, then why would she take such care in her will to state that she owned 9-1A and Junior "formerly owned" 9-1A? Also, why would decedent set up a facade of treating Junior and Wendeler equally, while in substance (according to petitioner's interpretation) giving Junior just a small fraction of her estate? Although neither side's view of the instant case persuasively explains all of the evidence, petitioner's theory explains much less of the evidence than does respondent's theory. From the foregoing, we conclude, and we have found, that there was no understanding between decedent and Junior to establish an express trust. The slight evidence of Junior's care of 9-1A is consistent with what one might expect where a son occupies property owned by his mother, and does not rise to the level of past performance of the sort that warrants an exception to the Connecticut Statute of Frauds. See H. Pearce Real Estate Co., Inc. v. Kaiser, 176 Conn. 442, 408 A.2d 230, 231 (1979). *556 Also, Junior did not purchase 9-1A at the time he quit claimed 9-1A to decedent, so there are not grounds for a resulting trust in Junior's favor. Farrah v. Farrah, 187 Conn. 495, 446 A.2d 1075, 1078 (1982). Petitioner contends that "A resulting trust may arise also when an express trust fails or is unenforceable." However, we have concluded that there was no intent to establish an express trust, so petitioner's alternative argument also fails to support a resulting trust in the instant case. Petitioner relies primarily on the doctrine of constructive trust and contends that "In virtually all material respects, the facts in Cohen [v. Cohen, 182 Conn. 193, 438 A.2d 55 (1980)] are identical to those here, and the same result should obtain." In Cohen v. Cohen, the court concluded that the son agreed to reconvey his interest in the property to his mother (438 A.2d at 60), and that the son had originally persuaded his mother to convey an interest in the property to him (438 A.2d at 61). In the instant case, there is no evidence that decedent persuaded Junior to convey the property to her. Although there is some evidence that decedent intended to reconvey the property to Junior, other *557 evidence is inconsistent with that intent, and we conclude that decedent did not have that intent. Thus, we conclude that Cohen v. Cohen is distinguishable from the instant case. In Cohen v. Cohen, the mother furnished all the consideration in cash for the property, but had the property conveyed to herself and her son as joint tenants with right of survivorship. Also, the mother paid all the carrying expenses for the property, including taxes and maintenance costs, while the son never paid any part of these expenses. 438 A.2d at 58. In the instant case, 9-1A was originally acquired by Senior. There is no evidence in the record as to the land's value at that time or when Senior gave 9-1A to Junior. Although Junior and Dill borrowed funds to pay for the construction of the house, there is no evidence in the record as to whether Junior paid off the loan out of his own funds, or decedent and Senior furnished the wherewithal to pay off the loan. Although there is some evidence of expenses and care of 9-1A by Junior, that evidence is too slight to preclude the possibility of decedent and Senior making substantial payments for taxes and maintenance. The Supreme Court of Connecticut *558 has directed that "before a court imposes a constructive trust upon real property on the ground that one deceased failed to fulfill a promise to another, the facts from which such trust may be implied should be clearly and satisfactorily established." Starzec v. Kida, 183 Conn. 41, 438 A.2d 1157, 1160 (1981). [7] In the instant case, the facts are unclear and our evaluation of the preponderance of the evidence is that decedent did not promise to reconvey 9-1A to Junior. As a result, we conclude that decedent did not hold 9-1A in constructive trust for Junior. Petitioner contends *559 that decedent held 9-1A subject to a contractual duty to convey it to Junior. Petitioner states that express trusts are simply a class of contractual undertaking. For the same reason that we concluded that decedent did not hold 9-1A under an express trust for the benefit of Junior, we also conclude that decedent did not hold 9-1A subject to a contractual duty to convey it to Junior. Similarly, we conclude that decedent did not hold 9-1A subject to a restitutionary claim by Junior equivalent to the value of 9-1A. We conclude that decedent, not Junior, owned the beneficial interest in 9-1A at the time of decedent's death. Accordingly, the $ 140,000 value of 9-1A is includable in the value of decedent's gross estate. Evidentiary and Related Rulings
In reaching this conclusion, we have taken into account testimony that was offered at trial as to which questions were raised under the hearsay rules of the Federal Rules of Evidence and under State law (in particular, the Dead Man's Statute, the Statute of Frauds, and the parol evidence rule of Connecticut law). The questions were raised with regard to testimony as to statements by Junior and decedent, offered by petitioner for the truth *560 of these statements. Petitioner offered these statements to show that Junior and decedent had an agreement that Junior continued to own the entire beneficial interest in 9-1A and decedent had only bare legal title at her death. The trial in the instant case was held years after decedent's death (of course) and Junior's death. Because our conclusions as to decedent's ownership have been reached taking into account the testimony offered by petitioner that otherwise might be excluded, the question of whether any of this testimony should have been excluded becomes moot. We hold for respondent. Decision will be entered for the respondent. Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954, as in effect for the date of decedent's death.↩
2. In the petition, in the opening statement, and during the trial, petitioner contended that decedent held 9-1A under a constructive trust for Junior. On brief, petitioner claims in the alternative that Junior's right to 9-1A could be founded on theories of (1) express trust, (2) resulting trust, (3) constructive trust, (4) contractual duty to reconvey, or (5) restitution. ↩
3. The parties informally advised us at trial that they were continuing to dispute this case because Junior's estate was sufficiently small that it would not benefit from the credit for tax on prior transfers provided by section 2013.↩
4. SEC. 2031. DEFINITION OF GROSS ESTATE. (a) General. --The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated. ↩
5. SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST. The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death. ↩
6. As we stated in Ward v. Commissioner, 87 T.C. 78, 92 (1986) -- In making this determination , we are, "in effect, sitting as a state court," being bound by decisions of the Supreme Court of [Connecticut] and "giving 'proper regard' to relevant rulings of other courts of the State." Commissioner v. Estate of Bosch, 387 U.S. 456, 465 (1967); Estate of Fulmer v. Commissioner, 83 T.C. 302, 306 (1984). See Chandler v. United States, 177 F.Supp. 565, 567↩ (D.N.H. 1959).
7. It is not clear whether Connecticut law would impose an extraordinary burden of proof on one who seeks to establish a constructive trust ( Starzec v. Kida, 183 Conn. 41, 438 A.2d 1157, 1160 n.3 (1981)) and, if so, then whether this Court is bound to impose the same extraordinary burden of proof ( Ward v. Commissioner, 87 T.C. 78, 93 n.4 (1986)). We do not have to decide either of these questions in the instant case because we have concluded that the preponderance of the evidence favors the party opposing establishment of a constructive trust. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1218↩ n.18 (1987).